**Robert L. MADDOX, et al., Plaintiffs,**

v.

**Merrell WILLIAMS, Defendant.**

**Misc. No. 94–0171 (HHG).**

United States District Court,
District of Columbia.

June 6, 1994.

Reconsideration Denied June 20, 1994.

William C. Hendricks, III, Paul J. Larkin, Jr., Zachary T. Fardon, King & Spalding, Washington, DC, for Brown & Williamson.

Thomas J. Spulak, General Counsel, Charles Tiefer, Deputy General Counsel & Sol., Office of General Counsel, U.S. House of Representatives, Washington, DC, for House Respondents.

Stuart F. Pierson, Davis Wright Tremaine, Washington, DC (Douglas P. Jacobs, Helen M. Gold, CBS Inc., New York City, of counsel), for CBS Inc., and Linda Douglas.

Theodore B. Olson, Terence P. Ross, Theodore J. Boutrous, Jr., Gibson, Dunn & Crutcher, Washington, DC, for Press Respondents.

## OPINION

HAROLD H. GREENE, District Judge.

### I

### Factual Background

On May 17, 1994, at the request of Brown and Williamson Tobacco Corporation (B & W), a major manufacturer of tobacco products, the Superior Court of the District of Columbia issued subpoenas for the testimony of and the production of documents by two Members of Congress—Henry Waxman, Chairman of the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce, and Ron Ryden, a member of that subcommittee.[1] Similar subpoenas were served on various media companies and their reporters, including CBS, Inc. and Linda Douglas.

1. These Members of Congress will generally hereinafter be referred to collectively as the congressional defendants.

The subpoenas were issued in connection with a tort action brought by members of B & W's law firm in Jefferson County Court in Kentucky. B & W intervened in that lawsuit and is referred to there as an intervening plaintiff. Judge Thomas Wine of the Kentucky state court issued an order directed to Dr. Merrell Williams, formerly a paralegal in the Kentucky law firm, prohibiting him from disseminating certain B & W documents to others.[2]

According to the congressional defendants, the media defendants, and press reports[3] filed with the Court, the documents at issue suggest that B & W may have known as long ago as 1963 that tobacco smoking might be responsible for serious health hazards and was addictive, but that it may nevertheless have denied the existence of such problems even in the face of a major report of the Surgeon General of the United States[4] and the conclusions of various scientific panels.[5]

B & W, it is asserted in defendants' papers, never publicly revealed the existence of the 1963 studies, and its spokesmen (and those of other tobacco companies) consistently continued to claim that no such problems existed or were known to the companies.[6] Although the record is not entirely clear, it appears that the documents B & W seeks from the congressional and the media defendants may connect B & W's management with knowledge of the hazards of cigarette smoking from the 1960s on.

The Waxman subcommittee is presently engaged in investigating the issues of health hazards and tobacco addiction. It is in this factual context that B & W secured from Judge Wine in Kentucky the order described below, and it is on the basis of that order that the D.C. Superior Court issued the subpoenas referred to above. The order and thus the subpoenas require Chairman Waxman and Representative Ryden to appear on a date and at a time certain at the offices of King & Spalding, counsel for B & W,[7] "for the purpose of inspection and copying of all alleged B & W and affiliated companies' documents in the possession, custody, and control of these [Members of Congress] or any subordinate or agent or representative ... and which were referred to in" certain newspaper articles or radio broadcasts.

Judge Wine's order further prohibits "counsel for any ... party" other than B & W to examine such Members of Congress about the contents of the documents or "any impressions or conclusions of the witness or any other person relating thereto." Inasmuch as the documents are said by Judge Wine and B & W to constitute the only relevant topic at the deposition, the restriction means that no one other than B & W counsel may examine the Members of Congress.

On May 19, 1994, the congressional defendants removed the Superior Court matter to this Court, relying upon 28 U.S.C. §§ 1442(a)(1) and (4). Although CBS and Linda Douglas also filed pleadings in this Court, apparently on the assumption that the subpoenas to them were likewise removed

2. Williams has provided some of the documents to counsel for plaintiffs in the Kentucky lawsuit but he has refused to provide others.

3. There is a dispute about statement allegedly made by B & W's counsel as reported by the *New York Times*. However, this is a side issue not relevant here.

4. U.S. Department of Health, Education, and Welfare, U.S. Surgeon General's Advisory Committee, Smoking and Health (1964).

5. According to these reports, tobacco smoking is a major cause of lung cancer, heart attacks, and other serious ailments. In 1984, Congress decided that health warnings had to be affixed to all cigarette packs, billboards, and television and radio advertisements, and with President Rea-

gan's signature, the congressional bill became law.

6. As Judge Wine stated in his order of April 8, 1994, "While the Court recognizes that Williams may have, through the attorney-client relationship discovered contradictory information to the Plaintiff B & W and other cigarette companies' claims that cigarette smoking is not harmful. (sic) This Court still does not believe that the end justify the means." That statement is not unambiguous, but it does seem to imply a recognition that Williams has evidence indicating that smoking is harmful to health.

7. The order was issued on May 13, 1994, requiring the appearance of the Congressmen at 9 a.m. on May 19, 1994. The current judicial proceedings have apparently postponed that deadline.

from the Superior Court, no adequate removal papers have actually been filed on their behalf.

The congressional defendants and some of the media defendants have since moved in this Court to quash the subpoenas, and B & W has filed papers challenging both this Court's jurisdiction with respect thereto and the substance of defendants' arguments on the motions to quash. The Court set a briefing schedule, and on June 3, 1994, it heard oral argument from the interested parties. This Opinion disposes of all the issues pending before the Court.

## II

### Jurisdiction

■ A. Little need be said regarding the jurisdictional issues as they pertain to the news media segment of this dispute. The media defendants have not sought formally to remove the controversy from the Superior Court to this Court,[8] and there is substantial doubt whether any basis exists for such removal.[9] In the absence of a valid removal, this Court of course lacks jurisdiction over the motion to quash the subpoenas filed by CBS and Linda Douglas. That motion is accordingly denied for lack of jurisdiction.[10]

B. A different result obtains with respect to B & W's claim that the federal courts, including this Court, lack jurisdiction over the matters raised with respect to the Members of Congress.

28 U.S.C. § 1442 provides for the removal of a civil action against "any officer of the United States ... for any act under color of such office."[11] This statute is designed to provide federal officials with a federal forum in which to raise defenses arising from their federal official duties. *Willingham v. Morgan,* 395 U.S. 402, 405, 89 S.Ct. 1813, 1815, 23 L.Ed.2d 396 (1969). More specifically, as the Fifth Circuit has phrased it, in enacting this law the Congress recognized that "federal officers are entitled to, and the interest of national supremacy requires, the protection of a federal forum in those actions commenced in state court that could arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials." *Murray v. Murray,* 621 F.2d 103, 106 (5th Cir.1980).

■ B & W argues that the federal courts may become involved in the consideration of state court proceedings against federal officials only if the particular proceeding is technically designated as a civil or criminal action. While a literal reading of the statute may support this argument, the courts have long interpreted it to include matters, such as subpoenas, that are only incidents of civil and criminal actions, yet have the same interference effect as that recognized in *Willingham* and *Murray, supra.* See, e.g., *Boron Oil Co. v. Downie,* 873 F.2d 67 (4th Cir.1989) (federal party removal of subpoena proceedings proper even though the underlying civil action was not removed); *State of Florida v. Cohen,* 887 F.2d 1451, 1153 (11th Cir.1989) ("section 1442(a)(1) permits the removal not only of those actions commenced in state court that potentially expose a federal official to civil liability or criminal penalty for an act performed in the past under color of office, but also the removal of civil matters that seek to either prohibit or require certain actions by a federal official in the future");

8. The filing of papers here by CBS and Ms. Douglas subsequent to the removal of the congressional defendants' part of the case cannot be regarded as effecting a transfer of the media part of the controversy to this Court.

9. The only removal statute upon which the media defendants could possibly rely is 28 U.S.C. § 1441, the general removal statute. In any event, these defendants have not followed the removal procedure as mandated by 28 U.S.C. § 1446.

10. Counsel for the media recognized at the hearing held on June 3, 1994, that their controversy

with B & W was not before this Court. The dismissal of their aspect of the case is without prejudice to whatever pleadings these parties may file in Superior Court.

11. The federal officer removal statute has a long history. The first such removal provision was included in a 1815 customs statute, and various versions existed until Congress ultimately extended the statute to cover all federal officers by enacting the current provision as part of the Judicial Code of 1948. *See Willingham v. Morgan,* 395 U.S. 402, 405–07, 89 S.Ct. 1813, 1815–16, 23 L.Ed.2d 396 (1969).

*Environmental Enterprises, Inc. v. United States Environmental Protection Agency,* 664 F.Supp. 585 (D.D.C.1987) (subpoenas to EPA quashed which were issued by D.C. Superior Court ordering testimony and production of documents in connection with a state civil action in which EPA was not a party); *Sharon Lease Oil Co. v. F.E.R.C.,* 691 F.Supp. 381, 385 (D.D.C.1988) (court quashed subpoena on basis that state court had no jurisdiction to compel non-party federal official to testify or produce documents). The Court concludes that, in view of the case law, the B & W position which would restrict removals to full-fledged civil and criminal actions, is lacking in merit.[12]

Indeed, as a matter of logic, history, and common sense there is no basis for distinguishing for these purposes between a civil or criminal action, on the one hand, and a subpoena or other order commanding acts to be performed by federal officials, on the other. The interference with the functioning and the jurisdiction of such federal officials as Members of Congress, Members of the Cabinet, and other federal agency employees is as great in the one category as in the other, and removal to a federal forum is therefore as appropriate in the one category as in the other.

The Court concludes that the removal was proper, and that it has jurisdiction of the motion to quash filed on behalf of the Members of Congress.

12. That lack of merit is underlined by the cases the company cites, none of which support its position. Thus, B & W contends that *State of Florida v. Cohen, supra,* was held removable only because contempt proceedings had been started against the federal official. But the *Cohen* opinion makes it clear that only two prerequisites are required for a successful removal: (1) the case must be against a federal officer acting under color of law, and (2) the officer must raise a colorable defense arising out of the duty to enforce federal law. The court's remarks regarding contempt were pertinent only because that stage happened to be the one at which removal was sought. In *Dent v. Packerland Packing Co., Inc.,* 144 F.R.D. 675 (D.Neb.1992), the court upheld the removal. Likewise, in *In re Doe,* 801 F.Supp. 478 (D.N.M.1992), the court concluded that removal was not proper where a violation of the state code of ethics was at issue.

## III

### Speech or Debate Clause

■ Article I, section 6 of the Constitution provides that "for any Speech or Debate in either House, they [the Senators and Representatives] shall not be questioned in any other place." The Speech or Debate Clause, rooted in the English Bill of Rights, 1 W. & M., Sess. 2, ch. 2 (1689), is designed to preserve legislative independence. *See United States v. Brewster,* 408 U.S. 501, 508, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972).

■ To that end, the lower federal courts have repeatedly been admonished to read the Clause broadly. *See, e.g., United States v. Johnson,* 383 U.S. 169, 180, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966). It is likewise established that included within the Clause's reach are all the things "generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1881).

More specifically, the Clause has been held by the Supreme Court to reach those matters that are "an integral part of the deliberative and communicative processes by which members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972).[13]

Indeed, contrary to B & W's position, the law is that a federal official need not wait for a contempt citation before removing his case to federal court. *State of Louisiana v. Sparks,* 978 F.2d 226, 232 (5th Cir.1992); *Nationwide Investors v. Miller,* 793 F.2d 1044, 1045 (9th Cir. 1986).

13. Excluded from the protection of the Speech or Debate Clause are activities that are not legislative but political in nature, such as " 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress." *United States v. Brewster, supra,* 408 U.S. at 512, 92 S.Ct. at 2537.

■  With this framework in mind, the Court rejects B & W's claim that the documents at issue and the related congressional testimony are not protected by the Speech or Debate Clause. The subpoenas before the Court were secured by a corporation currently under investigation by a House of Representatives committee, and these subpoenas, moreover, were served on the Chairman and another Member of the committee conducting that very investigation. The interference with congressional operations is thus as plain and direct as it appears to be intentional.

The Supreme Court has

> often noted that the power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.' . . . To conclude that the power of inquiry is other than an integral part of the legislative process would be a miserly reading of the Speech or Debate Clause in degradation of the 'integrity of the legislative process.'

*Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 504–05, 95 S.Ct. 1813, 1821–22, 44 L.Ed.2d 324 (1975). *See also, Government of Virgin Islands v. Lee,* 775 F.2d 514, 522 (3rd Cir.1985).[14]

The B & W subpoenas direct the Chairman of the Subcommittee on Health and the Environment and another Subcommittee Member personally to submit to depositions in the law offices of the corporation under investigation, and they further direct these Members of Congress to provide documents or copies to that corporation from among the documents in the possession of the Congress. It would be difficult to find orders that more directly impede the official responsibilities of the Congress and are thus in direct violation of the Speech or Debate Clause.

B & W contends that release of the copies would not harm the committee or the Congress. The Congressmen, for their part, resist relinquishing the copies primarily on the ground that such release would permit identification of the source of the documents in contravention of the confidentiality promised that source, and the chilling effect such release and such identification would have on future sources.

The Members' point is well taken. *See Miller v. Transamerican Press, Inc.,* 709 F.2d 524, 530–31 (9th Cir.1983), where the court stated:

> Informants, may in confidence, give information that is useful in exposing corruption within the government or elsewhere. If a source's identity is disclosed, he could suffer serious adverse consequences . . . The possibility of public exposure could constrain these sources. It could deter constituents from candid communication with their legislative representatives and otherwise cause the loss of valuable information.
>
> More to the point, it would chill speech and debate on the floor. The Congressman might censor his remarks or forego them entirely to protect the privacy of his sources, if he contemplated that he could be forced to reveal their identity in a lawsuit.
>
> We conclude that the privilege extends to questions about a Congressman's sources of information.

B & W next argues at length that the documents came into the Committee's possession at the end of a chain of facts that began with a theft and a violation of an attorney-client privilege.[15]

The Supreme Court has squarely held that the use by a congressional committee of in-

---

**14.** B & W's reliance on *In re Grand Jury,* 587 F.2d 589 (3rd Cir.1978), is misplaced. In that case the Third Circuit distinguished between telephone toll records that were records of legislative calls protected by the Speech or Debate Clause and records of personal calls that were not. *Id.* at 596. The documents at issue here are clearly part of a legislative investigation, a fact recognized even by the Kentucky court which enjoined not only the Members of Congress but also their official staffs ("any subordinate or agent or representative").

**15.** The Court does not know and therefore does not decide whether the company's assertions are true.

formation that is gathered illegally[16] is nevertheless protected by the Speech or Debate Clause, provided the use occurs in the course of a legitimate legislative investigation, and the Congressmen were not personally involved in the criminal activity.[17] Thus, in *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967), the Court stated that an action against the Chairman of the Internal Security Subcommittee of the United States Senate's Judiciary Committee was properly dismissed under the Speech or Debate Clause, and retention and use of certain records by that Subcommittee were protected by that Clause, even against a claim that the records had been secured by means of a conspiracy and other illegal acts. *See Eastland v. United States Servicemen's Fund, supra,* 421 U.S. at 501, 95 S.Ct. at 1820; *Doe v. McMillan,* 412 U.S. 306, 312–13, 93 S.Ct. 2018, 2024–25, 36 L.Ed.2d 912 (1973); *United States v. Brewster, supra,* 408 U.S. at 516, 92 S.Ct. at 2539; *Powell v. McCormack,* 395 U.S. 486, 502–03, 89 S.Ct. 1944, 1953–55, 23 L.Ed.2d 491 (1969); *United States v. Johnson,* 383 U.S. 169, 184–85, 86 S.Ct. 749, 757–58, 15 L.Ed.2d 681 (1966); *Dombrowski v. Burbank,* 358 F.2d 821 (D.C.Cir.1966).[18]

The rationale for a judicial recognition of a congressional power in such circumstances was provided, *inter alia,* in *Eastland v. United States Servicemen's Fund, supra,* 421 U.S. at 503, 95 S.Ct. at 1821:

The applicability of the Clause to private civil actions is supported by the absoluteness of the term "shall not be questioned,"

and the sweep of the term 'in any other Place.' ... [A] private civil action, whether for an injunction or damages, creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation. Moreover, whether a criminal action is instituted by the Executive Branch, or a civil action is brought by private parties, judicial power is still brought to bear on Members of Congress and legislative independence is imperilled.

In short, if under the Constitution congressional action "shall not be questioned" in order to preserve a broader good—an independent Congress—the seizure of congressional files, whether or not by a court order, is directly inconsistent with the constitutional design.[19]

Finally, it is B & W's position that none of these legal rules is pertinent to the instant controversy because the company seeks only "testimonial certification" of the documents in question. Whatever that phrase may mean,[20] and regardless · of the number of questions that will be asked,[21] the fact is that B & W is seeking compulsion to depose Members of Congress on information acquired in the pendency of an active investigation.

As our own Court of Appeals has established, "[d]iscovery procedures can prove just as intrusive" as can naming Members or their congressional staffs as parties to a suit. *MINPECO v. Conticommodity Services,* 844

---

**16.** It is questionable whether the events here may properly be described as a theft. *See* note 35, *infra.*

**17.** The rule is different if the Members of Congress themselves had participated in the illegal activities to secure the documents. *See, e.g., United States v. Brewster, supra; Gravel v. United States, supra,* 408 U.S. at 624, 92 S.Ct. at 2626. B & W makes no such claim here.

**18.** B & W relies on *McSurely v. McClellan,* 553 F.2d 1277 (D.C.Cir.1976), to make its contrary point on this issue. However, *McSurely* actually stands for the opposite proposition. Our Court of Appeals there found that the "law is clear that even though material comes to a legislative committee by means that are unlawful or otherwise subject to judicial inquiry, the subsequent use of

the documents by the committee staff in the course of official business is privileged legislative activity." *Id.* at 1297.

**19.** The remedy for congressional overreaching is always at hand: an election.

**20.** B & W does not explain it, nor do any of the cases that party cites.

**21.** It is of course impossible at this juncture to know what will be asked once the Members of Congress appear in the offices of B & W's lawyers. Indeed, Judge Wine's unusual prohibition on questions by anyone other than those lawyers does not inspire confidence that regular, traditional procedures will be followed. (Judge Wine's order also precludes consultation between Dr. Williams and his attorneys.)

F.2d 856, 859 (D.C.Cir.1988). And the court went on to say in that leading decision (844 F.2d at 859–60): [22]

> We are equally unconvinced by the Hunts' argument that enforcement of the subpoenas would impose only minimal burdens on the subcommittee and its staff; as 'the Hunts seek no substantive or extensive testimony from a Member of Congress or a current Congressional staff member,' the intrusions on their time will be minimal; as the investigation at issue had terminated seven years earlier, 'there is no danger of disrupting an ongoing legislative investigation.' Brief for Appellants at 20. If the Hunts' theory were correct, each time a subpoena is served on a committee, an initial judicial inquiry would be required to calibrate the degree to which its enforcement would burden the committee's work. Such a consequence would be absurd.[23]

In short, the Speech or Debate Clause stands as an insuperable obstacle to B & W's attempt to acquire by compulsion documents or copies of documents in the possession of the Congress.[24]

**22.** B & W also attempts to carve out a distinction between statements made by the Congressmen themselves and those found within the documents at issue. There is no such distinction under the Speech or Debate Clause. As *MINPECO* teaches, the "process by which a committee takes statements and prepares them for publication clearly qualifies as an activity 'within the legislative sphere.'" 844 F.2d at 860.

**23.** B & W also relies on the views of Judge Oliver Gasch of this Court for the proposition that the passive receipt by congressional staff of information provided voluntarily by outside sources is not a legislative act entitled to protections under the Speech or Debate Clause. *Tavoulareas v. Piro*, 527 F.Supp. 676 (D.D.C.1981). However, this case is factually quite different in that here the Subcommittee guaranteed confidentiality to Dr. Williams before he surrendered the documents—a factor which Judge Gasch suggested would take the case out of the "passive" category. 527 F.Supp. at 681. In any event, with due respect to a brother Judge, it is this Court's opinion that *Tavoulareas* in its broader aspects does not correctly state the law. The Court of Appeals for the Ninth Circuit has expressed its disagreement with the *Tavoulareas* decision on a number of grounds, including that of the chilling effect a *Tavoulareas* rule would have both on

## IV

### Supremacy Clause

■ The same result is reached by reasoning based directly on the Supremacy Clause of the United States Constitution.

Two bodies seek control of documents which presumably disclose what B & W's management knew or did not know some thirty years ago regarding the dangers to health presented by tobacco—the Kentucky court for use in a civil lawsuit, on the one hand, and Members of Congress engaged in an investigation of the subject discussed in those documents, on the other. Under the Constitution, there can be no question as to which body has the superior claim.

■ Article VI of the Constitution expressly provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land...." Under this provision, Congress' powers, as well as federal judicial actions in conformity with federal law, override state court rulings and determinations in the event that there is a conflict. *See generally, Cooper v. Aaron*, 358 U.S. 1,

prospective witnesses and Members of Congress. *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530–31 (9th Cir.1983). This Court considers *Miller* the better reasoned opinion and would follow it here even if this case were factually not distinguishable from *Tavoulareas*.

**24.** If the Court did not quash the subpoenas on the grounds explained in this Opinion, it might well be justified in quashing them on the basis that the depositions they authorize do not comport with the Federal Rules of Civil Procedure in force and effect here (and similar rules applicable in the D.C. Superior Court). Fed.R.Civ.Pro. 30(c) provides that deposition "[e]xamination and cross-examination of witnesses may proceed as permitted at the trial under the provision of the Federal Rules of Evidence...." As noted, Judge Wine's order permits no examination or cross-examination by counsel for the congressional defendants; indeed, it forbids their participation in the questioning but allows interrogation of witnesses only by counsel for the tobacco company. The Kentucky court's direction to require judicially-sanctioned proceedings in the District of Columbia to proceed without the protections of elementary due process might be an adequate basis for not enforcing the Kentucky directive by subpoena. Neither of the parties has briefed this issue, however, and the Court has not considered its full implications.

78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Swift & Co. v. Wickham,* 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

It follows that the attempt by a state court in Kentucky to reach out to require Members of a congressional committee to furnish documents in their possession to a party to a civil lawsuit in that State is doomed to failure under the American constitutional system itself.

B & W's reliance to the contrary on *Gravel v. United States, supra,* is misplaced. In that case, the Supreme Court was dealing with an investigation into the question whether private publication by a congressional staff member of the classified Pentagon Papers violated the law. The Court considered whether the Speech or Debate Clause shielded a Member of Congress under these circumstances from an inquiry by a *federal grand jury into possible violations of United States law,* and it concluded that it did not. That factual pattern is a far cry from a *state court inquiry as part of a civil suit into an official, legitimate, congressional investigation.* There are so many obvious and crucial differences between the two situations that the *Gravel* decision must be regarded as being only of the most tenuous relevance.

No doubt, while this nation was governed prior to 1788 under the Articles of Confederation, a State demand for the surrender of documents from delegates to the Continental Congress would have had a fair chance of success. However, the Constitution, and in particular the key Article VI of that charter, were adopted precisely to forestall the fragmentation that afflicted the nation under the Articles, and to prevent local interference with the operations of the national government and the resulting weakening of that government's authority. *See generally, United States v. Allegheny County,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944).

Such deleterious consequences, however, would be well-nigh inevitable if each of the hundreds of state courts could summon federal legislators or their papers at the request of any civil [25] litigant.[26] It would be a direct affront to the framers and the language they embodied in Article VI were this Court to give effect to the Kentucky state court injunction which imposes substantial burdens on national legislators [27] and represents a serious obstacle to the execution of their duties and responsibilities.[28]

To be sure, B & W insists that it, and the Kentucky court, are merely attempting to gain control of property that was stolen or obtained in violation of an attorney-client privilege. It may well be that B & W so considers the documents at issue here. However, viewed from another perspective, they may be evidence supporting a "whistle-blower's" claim that the tobacco company concealed from its customers and the American public the truth regarding the health

---

**25.** It is not necessary to the outcome of this litigation to speculate on what the result would be if demand for the documents had been made in a *criminal* context or, as in *Gravel, supra,* if the requesting body were a *federal* grand jury.

**26.** The federal courts are abundantly familiar with the hundreds, if not thousands, of suits filed every year, many but not all by *pro se* litigants, against anyone whose name appears prominently in a newspaper or a television program, or who can be associated, however tenuously, with some grudge or hoped-for claim the plaintiff may hold.

**27.** As Judge Learned Hand explained in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949):

[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put it to satisfy a jury of his good faith. * * * [I]t has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

**28.** Perhaps the best known examples in recent memory of the need to protect federal officials and their jurisdiction from parochial interests of state and local judicial, legislative, or executive officers arose in the civil rights controversies surrounding the federal court-ordered desegregation of such institutions as Central High School in Little Rock, Arkansas; the University of Alabama; the University of Mississippi; and the public schools in New Orleans, to name but a few. The civil rights disputes in the 1960s do not, of course, exhaust the list of the need for the protection of federal jurisdiction from local interests.

hazards of tobacco products,[29] and that he was merely bringing them to the attention of those who could deal with this menace. With the situation in that posture, to accept blindly the B & W "stolen goods" argument would be to set a precedent at odds with the law, with equity, and with the public interest.[30]

If the B & W strategy were accepted, those seeking to bury their unlawful or potentially unlawful acts from consumers, from other members of the public, and from law enforcement or regulatory authorities could achieve that objective by a simple yet ingenious strategy: all that would need to be done would be to delay or confuse any charges of health hazard, fraud, corruption, overcharge, nuclear or chemical contamination, bribery, or other misdeeds, by focusing instead on inconvenient documentary evidence and labelling it as the product of theft, violation of proprietary information, interference with contracts, and the like.[31] The result would be that even the most severe public health and safety dangers would be subordinated in litigation and in the public mind to the malefactors' tort or contract claims, real or fictitious.

The law does not support such a strategy or inversion of values. There is a constitutional right to inform the government of violations of federal laws—a right which under Article VI supersedes local tort or contract rights [32] and protects the "informer" from retaliation.[33]

Whatever may be the proper result in a suit for damages between the private contending parties—a matter on which the Court expresses no opinion—on another question there can be no doubt: the right of federal public health and safety authorities to the custody of the documents evidencing dangers to public health or concealment of knowledge of such dangers by those in a position to abate them clearly prevails over purely private claims involving contracts or torts.[34]

Thus, even if it be assumed, *arguendo*, that the documents at issue here deserve the labels B & W attaches to them, it would not materially advance that party's cause. Such an assumption would certainly place a mantle of legality on the Kentucky court's order; but it would not establish that order's superiority with respect to document custody in a contest with Members of Congress engaged in the legitimate pursuit of *their* responsibilities. As explained above, in any such contest, Article VI of the Constitution awards the decision to the federal legislative authority.

## V

### Conclusion

This is a seemingly arcane dispute over subpoenas and motions to quash them. But what is involved at bottom is not arcane at all: it is a dispute over documents which may reveal that the Brown & Williamson tobacco

---

**29.** That health hazard is of course not a mere figment of Dr. Williams' imagination; the Surgeon General and many eminent scientific panels have found such a hazard to exist, and the Waxman subcommittee, as noted, is investigating this problem at this very moment.

**30.** These considerations also apply to the attorney-client segment of the B & W argument.

**31.** One may well doubt, to put it charitably, that B & W would be mounting a tremendous and costly effort, in Kentucky and in the District of Columbia, in proceedings against members of a congressional committee and against the mass of the media, if the documents at issue did not represent the proverbial "smoking gun" evidencing the company's allegedly long-held and long-suppressed knowledge that its product constitutes a serious health hazard.

**32.** Congress has even implemented that right, albeit in a limited factual context, by enactment of the Qui Tam provisions of the False Claims Act. 31 U.S.C. § 3730.

**33.** *See In re Quarles,* 158 U.S. 532, 536–38, 15 S.Ct. 959, 961, 39 L.Ed. 1080 (1895); *Motes v. United States,* 178 U.S. 458, 463, 20 S.Ct. 993, 995, 44 L.Ed. 1150 (1900); *United States v. Guest,* 383 U.S. 745, 771, 779, 86 S.Ct. 1170, 1185, 1189, 16 L.Ed.2d 239 (1966) (Harlan, J. and Brennan, J., concurring and dissenting in part); *Habib v. Edwards,* D.C. Court of General Sessions (1965) (Greene, J.), *aff'd on other grounds, Edwards v. Habib,* 397 F.2d 687 (D.C.Cir.1968).

**34.** *A fortiori* this also applies to those in Congress who have oversight responsibilities over the Executive health and safety officials.

company concealed for decades that it knew its products to be both health hazards and addictive. The subpoenas are the means by which the company is seeking to intimidate, and in a sense to punish, both Dr. Williams, the discoverer of evidence of this possible concealment, and the national legislators who are seeking to investigate the subject further and bring the results to the attention of the Congress and the public. Dr. Williams is being proceeded against in a Kentucky state court for an alleged theft,[35] and the Congressmen have been brusquely summoned by subpoena to the offices of the tobacco company's lawyers, with an explicit direction from a Kentucky judge that only those lawyers and none others may ask questions.

As explained above, there are several rules, even constitutional doctrines, that stand in the way of so high-handed a course of conduct, and one so patently crafted to harass those who would reveal facts concerning B & W's knowledge of the health hazards inherent in tobacco. The Court sees no basis in law or justice for implementing the company's chosen course by assisting in the compulsion that would be effected by these subpoenas.

The motions to quash filed on behalf of Chairman Waxman and Representative Ryden are granted, and the subpoenas directed to them are hereby ordered quashed.

### *MEMORANDUM AND ORDER*

Brown and Williamson has moved for reconsideration of the June 6, 1994 Order granting the motion to quash subpoenas which would have required the attendance of Representative Henry Waxman and Ron Ry-

den and the production of certain documents. While B & W raises four arguments in support of its motion, only one deserves discussion.[1]

▮ It is B & W's claim that because counsel for the congressional defendants stated during the hearing of June 3, 1994 that "intermediaries" were involved in providing the documents to the House committee, the Members of Congress in possession of these documents lost their constitutional protection of the Speech or Debate Clause with respect thereto. This contention appears to be addressed to the point in the Court's June 6 Opinion that, when a Member of Congress is personally and actively involved in the criminal acquisition of information, the protection of that Clause is not available to him. In the context of the factual and legal posture of this proceeding, the B & W argument entirely lacks merit.[2]

In the first place, not even the Kentucky court has decided, or has had jurisdiction to decide, that *anyone* is guilty of criminal activity with regard to the acquisition of the documents.[3] It follows that the assumed factual predicate for the B & W argument is lacking. More important, the Members of Congress who are in possession of the documents being sought were by B & W's own admission not involved in unlawful activity if any occurred. There is therefore no valid basis whatever for finding a forfeiture of the Speech or Debate Clause or for allowing that corporation to interfere with the congressional probe, regardless whether the documents came to the Congress directly or through intermediaries.[4]

---

**35.** In its papers, B & W is rather liberal in charging again and again that it seeks the return of "stolen property" and that Dr. Williams is the thief. But no criminal charges have been filed against that individual by any prosecutor or any grand jury, here or in Kentucky.

**1.** The remaining contentions simply repeat, with slightly different terminology, points previously made and rejected by the Court.

**2.** B & W also relies for its conclusion on the fact that some individuals were promised confidentiality. It is not clear what that adds to the argument. Certainly a congressional committee, like a law enforcement body, may promise confi-

dentiality to its sources, and such a grant does not begin to prove or to suggest that the body which seeks so to protect its sources is involved in criminal activity. Sources are at times under threat from those with limited scruples or unlimited means but with a great deal at stake.

**3.** The Kentucky judge, acting exclusively within civil jurisdiction, has stated only that the actions of Dr. Merrell Williams, the alleged source of the documents, "could constitute" crimes.

**4.** Insofar as the Court has been able to determine, the "intermediaries" argument is not based on the decision of or language employed

B & W's reliance to the contrary on *McSurely v. McClellan,* 553 F.2d 1277 (D.C.Cir.1976) (*en banc*), is completely misplaced; that decision, far from supporting the B & W position, directly undermines it. In its June 6 Opinion, this Court described *McSurely* as holding that, even if material comes to a legislative committee by means that are unlawful, subsequent committee use of that material is nevertheless privileged. B & W's motion for reconsideration concedes that this is a correct reading of *McSurely.* B & W Memorandum in Support of Motion for Reconsideration at 6 n. 1. In light of that concession, it is difficult to understand on what conceivable basis the company could claim that the legislative privilege has been forfeited.

B & W's theory is faced with the further hurdle that the company is lacking even a colorable basis for its position that the documents were acquired by the congressional committee with unlawful means. To be sure, the company asserts, and it may be assumed *arguendo,*[5] that the documents were initially obtained by an individual through such means. However, there is no evidence that this individual was an employee or agent of the Congress, or that Members of Congress caused him to engage in unlawful activity or conspired with him in that endeavor.[6]

The crux of the matter is still this. B & W, through its management, may be asked to testify at a hearing conducted by a committee of the House of Representatives into grave allegations, apparently with substantial factual supporting evidence, that B & W's products present a threat to the health and indeed the lives of thousands, if not millions, of Americans, as well as into other serious allegations that B & W has for decades been engaged in a cover-up designed to mislead its customers and the public with respect to these health hazards.

Through the current proceedings B & W is attempting to interfere with that probe by a variety of means—by summoning the Congressmen to the offices of B & W's lawyers; by seeking to require them to identify their sources; and by seeking to require them to permit B & W to peruse documentary evidence that the committee may or may not ultimately use in its investigation. As the Court has previously concluded, the committee and the Members of Congress which sit on that body are clearly protected by the Speech or Debate Clause of the Constitution from such interference.

There being no meritorious basis for the motion for reconsideration, that motion is hereby denied.

---

by any court; it appears to be strictly a B & W creation.

**5.** The Court does not necessarily endorse that conclusion for any other purpose. All there is to support that hypothesis, as indicated, is the conclusion of a Kentucky judge engaged in civil litigation. No criminal charge or finding has been made by anyone anywhere.

**6.** *See McSurely, supra,* 553 F.2d at 1296–97, *citing Dombrowski v. Burbank,* 358 F.2d 821, 823–24 (1966) (court refused to enjoin chairman and chief counsel of a Senate subcommittee from using records that were seized by state officials in alleged conspiracy with subcommittee).