**BROWN & WILLIAMSON TOBACCO CORP., Appellant,**

v.

**Merrell WILLIAMS, et al., Appellees.**

### No. 94–5171.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1995.

Decided Aug. 15, 1995.

Kenneth W. Starr, Washington, DC, argued the cause, for appellant. With him on the briefs were William C. Hendricks, III, and Kerrie C. Dent, Washington, D.C. . Paul J. Larkin, Jr., Washington, DC, entered an appearance.

Barbara K. Bracher, Principal Asst. Gen. Counsel and Sol., Office of the Gen. Counsel, U.S. House of Representatives, Washington, DC, argued the cause, and filed the brief, for appellees.

Before: SILBERMAN, HENDERSON, and TATEL, Circuit Judges.

SILBERMAN, Circuit Judge:

Brown & Williamson appeals an order of the district court quashing subpoenas *duces tecum* issued to two Members of the House of Representatives. We affirm.

## I.

This case grows out of another lawsuit brought in Kentucky state court in September 1993 by the Louisville law firm Wyatt, Tarrant & Coombs (Wyatt, Tarrant) against a former paralegal at the firm, Merrell Williams. Williams had worked on confidential litigation-related document production for Wyatt, Tarrant in connection with the firm's representation of Brown & Williamson Tobacco Corp. (B & W) in products liability lawsuits. About a year after leaving the firm, Williams told Wyatt, Tarrant that he had made copies of various B & W documents to which he had had access; he delivered to the firm a box claimed to contain the copies in his possession. At the same time, he threatened to seek damages for injuries allegedly caused by smoking and by his exposure during the course of his employment to information that had induced psychological suffering.

Wyatt, Tarrant responded by suing Williams for breach of contract and various torts based on his filching of B & W documents, which the firm sought to have returned. The court ordered Williams to surrender any material still in his possession and issued a temporary injunction restraining him from disclosing or using any information acquired during his employment. B & W filed a motion to intervene, which was

granted several days after suit was brought. Williams filed his promised counter-suit against B & W six months later, in March 1994.

Sometime earlier, in July 1993, the House of Representatives' Subcommittee on Health and the Environment of the Committee on Energy and Commerce began hearings on the effects of tobacco products. Appellee Waxman was the chairman of that committee, and appellee Wyden apparently played a prominent role. By March 1994, the Subcommittee had turned its attention to the question of manipulation of nicotine levels by tobacco manufacturers, and on April 14, 1994, heard testimony on this subject from the CEOs of the nation's seven largest tobacco companies, including B & W. Following this hearing, on March 5, 1994, Chairman Waxman wrote B & W stating that the Subcommittee had "recently learned" that in the 1960s the company had conducted research into the pharmacological effects of nicotine and desired copies of any resulting studies and reports.

Two days later, on March 7, 1994, the first of several news stories concerning internal B & W documents appeared in the national media. And the following day, Representative Waxman stated in a radio interview that his subcommittee had recently received "documents that were evidently stolen from some law firm office that represented [B & W]." B & W then obtained an order from the Kentucky court directing Williams to appear for a deposition concerning the apparent receipt of its documents by Congress and various news reporters. The judge also issued an Order and Commission for the issuance of subpoenas *duces tecum* to Representatives Waxman and Wyden for "the production and inspection" of *all* B & W documents in the witnesses' possession as well as requiring the Congressmen to attend a deposition by B & W.[1] On appeal, however, the appellant assures us that it does not wish to depose the Congressmen. Similar Orders and Commissions authorized subpoenas to various reporters and news organizations as well.

The Kentucky court's orders were presented to the Superior Court for the District of Columbia, which issued the subpoenas on May 18, 1994. The following day, Representatives Waxman and Wyden filed a petition for removal with the United States District Court, along with a motion to quash the subpoenas on the ground that the Speech or Debate Clause, U.S. Const., art. I, § 6, cl. 1, excused them from compliance. The court determined that it enjoyed removal jurisdiction over the subpoena proceedings and, on June 6, 1994, granted the motion to quash. *Maddox v. Williams*, 855 F.Supp. 406, 411–13 (D.D.C.1994). The court agreed with the congressmen that the Speech or Debate Clause barred enforcement of the subpoenas.[2] B & W sought, and was denied, reconsideration, and appealed.

## II.

Before turning to the Speech or Debate Clause we must satisfy ourselves as to our jurisdiction. In the district court, and again here, B & W has questioned whether Representatives Waxman and Wyden, having merely been served with the subpoenas, were authorized to remove the proceedings to federal court. According to appellant, the rele-

---

1. The subpoenas stated that leave was given B & W "to take a deposition" of each congressman "for the sole and exclusive purpose of the inspection and copying of:"

 (a) all alleged Brown & Williamson and affiliated companies' documents, and copies of such documents, which are in the possession, custody, or control of the said witness, or any subordinate or agent or representative of him and which were referred to in:
 1. The New York Times article of May 7, 1994 relating to such documents;
 2. The National Public Radio interview on May 8, 1994 in which said witness discussed such documents;
 3. The National Public Radio broadcast on Morning Edition on May 13, 1994 relating to such documents;
 4. The Washington Post Article of May 14, 1994 relating to such documents; and
 (b) all other Brown & Williamson and affiliated companies' documents, and copies of such documents, in the possession, custody, or control of such witness.

2. In doing so, it declined to follow district court precedent holding that the passive receipt of documents provided by outside parties is not a legislative act entitled to protection under the Speech or Debate Clause. *See Tavoulareas v. Piro*, 527 F.Supp. 676 (D.D.C.1981).

vant federal removal statute, 28 U.S.C. § 1442(a) (1988), allows federal officers to transfer proceedings to a federal district court only when they are themselves *defendants* in the state court action. Under such circumstances the federal forum becomes necessary, we are told, because it is then that real concerns arise about the forum of adjudication. The congressmen are not defendants here but only *subjects* of subpoenas *duces tecum.* And while their refusal to comply may rest on assertions of federal privilege, that by itself is not enough to satisfy the statute's conditions for removal.

■ It is certainly true that the language of the removal statute ostensibly supports B & W's argument. The statute provides, in relevant part:

> A *civil action* or *criminal* prosecution commenced in a State court *against* any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1) Any officer of the United States ... for any act under color of such office ...
>
> \* \* \* \* \* \*
>
> (4) Any officer of either House of Congress, for any .act in the discharge of his official duty under an order of such House.

28 U.S.C. § 1442(a) (emphases added). By its terms, then, the statute confers removal jurisdiction over either a state court "civil action" or "criminal prosecution" brought "against" a federal official—as long as the "action" for which he is being questioned was undertaken "under color" of the federal office.[3] This last condition has long been interpreted to require "that federal officer removal must be predicated on the allegation of a colorable federal defense." *Mesa v. California,* 489 U.S. 121, 129, 109 S.Ct. 959, 965, 103 L.Ed.2d 99 (1989). That such a defense has

been raised is not contested. B & W disputes appellees' contention that the Speech or Debate Clause immunizes appellees from compliance with the superior court's subpoena, but it does not deny that the immunity asserted is an at least "colorable" federal defense. *See Willingham v. Morgan,* 395 U.S. 402, 407, 89 S.Ct. 1813, 1816, 23 L.Ed.2d 396 (1969).[4]

■ Appellant does, however, question whether it is possible to remove in the absence of some sort of proceeding *against* an official. The statute, it is argued, contemplates some state inquiry into an official's commission of an "act" under claim of federal office. And the superior court's subpoena order constitutes neither a "criminal prosecution" nor a "civil action." The latter, under the Federal Rules, is only created by the filing of a complaint. FED.R.CIV.P. 3. In response, the congressmen point to what they claim is the purpose of the removal statute, as described in the case law, rather than the actual language. They assert that § 1442(a) was designed to carry out a congressional intent "that federal officers, and indeed the Federal Government itself, [have] the protection of a federal forum," and that therefore "[t]his policy should not be frustrated by a narrow, grudging interpretation." *Willingham,* 395 U.S. at 407, 89 S.Ct. at 1816. The statute serves to "ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties," *Arizona v. Manypenny,* 451 U.S. 232, 241, 101 S.Ct. 1657, 1664, 68 L.Ed.2d 58 (1981), and "to maintain the supremacy of the laws of the United States by safeguarding officers and others acting under federal authority against peril of punishment for violation of state law." *Colorado v. Symes,* 286 U.S. 510, 517, 52 S.Ct. 635, 637, 76 L.Ed. 1253 (1932) (citing *Tennessee v. Davis,* 100 U.S. 257, 25 L.Ed. 648 (1880); *Maryland v. Soper (No. 1),* 270 U.S. 9, 32, 46

---

**3.** The courts of the District of Columbia are treated as "state" courts for removal purposes. *Palmore v. United States,* 411 U.S. 389, 395 n. 5, 93 S.Ct. 1670, 1675 n. 5, 36 L.Ed.2d 342 (1973).

**4.** Congress first established removal jurisdiction in 1815 as a temporary measure for federal customs officers. *See* Act of Feb. 4, 1815, § 8, 3 Stat. 195, 198. Later enactments broadened the

scope of officers entitled to seek removal and made the provision a permanent feature of the judicial code. For a brief history of the evolution of these statutes, *see Willingham,* 395 U.S. at 405–06, 89 S.Ct. at 1815–16. *See also* P. BATOR, D. MELTZER, P. MISHKIN, & D. SHAPIRO, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM, 1057–60 (3d ed. 1988).

S.Ct. 185, 190, 70 L.Ed. 449 (1926)). In light of these broad pronouncements (among others), § 1442(a) should, according to appellees, be interpreted to allow a federal officer to remove to federal court whenever he seeks to rely upon federal grounds in proceedings before a state court. The statute is not, in other words, limited to the situation where the federal officer asserts a federal excuse in defense of actions that are the focus of the state proceeding. It is also available when a federal privilege—here, the Speech or Debate Clause—is claimed to defeat an assertion of state court authority, such as the subpoenas at issue in this proceeding.

None of these Supreme Court cases, on which appellee relies, are directly on point. *Willingham*, for example, decided simply that the "color of office" test was satisfied by an officer's assertion of a colorable federal defense—a matter not disputed here. As the case fell squarely within the "civil action" category, *see* 395 U.S. at 409, 89 S.Ct. at 1817, it does not really bear on the issue before us. The same is true for *Manypenny* and *Symes*, which are essentially technical opinions. The former decided that states could appeal adverse judgments in removed criminal proceedings, *Manypenny*, 451 U.S. at 240–50, 101 S.Ct. at 1663–69, and the latter held that in "so exceptional a procedure" as removal of a state criminal case, an officer's removal petition could not rely upon conclusory statements, *Symes*, 286 U.S. at 519–20, 52 S.Ct. at 637–38 (quoting *Maryland v. Soper (No. 1)*, 270 U.S. at 33, 46 S.Ct. at 190–91).

The circuits that have considered whether proceedings not generally thought paradigm "civil actions" or "criminal prosecutions" can be removed under § 1442(a) have not been uniform in their approach. Garnishment proceedings, for example, have been held removable by the Ninth Circuit, *see Nationwide Investors v. Miller*, 793 F.2d 1044, 1046 (9th Cir.1986), but the Fifth Circuit came to the opposite conclusion, *see Hexamer v. Foreness*, 981 F.2d 821, 823 (5th Cir.1993). Those circuits to have confronted the question whether a contempt proceeding is removable have, however, answered affirmatively. *See Louisiana v. Sparks*, 978 F.2d

226, 231 (5th Cir.1992); *Florida v. Cohen*, 887 F.2d 1451, 1453 (11th Cir.1989); *Wisconsin v. Schaffer*, 565 F.2d 961, 963–64 (7th Cir.1977) (citing *North Carolina v. Carr*, 386 F.2d 129, 131 (4th Cir.1967)); *Boron Oil Co. v. Downie*, 873 F.2d 67, 68 (4th Cir.1989). To our knowledge, no court has held otherwise.

■ Indeed, appellant concedes that removal would be available *in this case* if the congressmen refused to comply with the subpoena and faced a civil contempt proceeding. That concession—a necessary one, we think—undermines part of their linguistic argument. An ancillary civil contempt proceeding is no more a "civil action" within the meaning of the federal rules than is a subpoena enforcement proceeding. If the former qualifies as a "civil action" under the removal statute there is no reason to conclude that the latter does not. There are still the questions, however, whether a subpoena enforcement proceeding should be thought a civil action "against" the congressmen as would be a civil contempt proceeding, and whether the congressmen can be thought to have "acted" within the meaning of the statute.

The only circuit case to have decided whether removal is available to assert a federal privilege against a subpoena is *Louisiana v. Sparks*. In *Sparks*, however, a "peculiarity of Louisiana law" collapsed the very issue in dispute between B & W and the congressmen. *Id.* at 232. The court upheld removal prior to the initiation of contempt proceedings, but rested its decision on the Louisiana courts' capacity to impose "direct" contempt sanctions—without opportunity for removal. *Id.* The court expressly reserved the question whether removal for purposes of resisting the subpoena would have been appropriate had there been an opportunity for removal at a later juncture, before the imposition of sanctions. *Id.* n. 10.

Admittedly, a civil contempt proceeding is closer in nature to a civil action than is a subpoena enforcement proceeding. And at the point of contempt, as appellant argues, a federal official's action is called into question—which is not really true at the earlier stage. Still in a subpoena enforcement pro-

ceeding the power of the state court is certainly directed "against" the target official. Although the federal officer might be thought to have not yet been called to account for his "action"—refusing to comply with the subpoena—prior to a contempt proceeding, that interpretation seems quite artificial. Once the subpoena is issued, a clash between state power and the federal official appears to be naturally inevitable. Certainly in any case in which the officer (typically represented by the federal government or Congress) seeks removal, we can assume the officer would be prepared to force the matter to a contempt proceeding—at which point removal is clearly available. Appellant has not suggested any reason why Congress would have wished that confrontation to be actually ignited before removal. We think, therefore, that the officer's "act," declining to comply with the subpoena, can be presumed to occur simultaneously with the removal petition. We do not believe Congress used the terms "civil action," "against," or "act" in the limited fashion that appellant urges, but rather meant to refer to any proceeding in which state judicial civil power was invoked against a federal official. Jurisdiction lies under § 1442(a).

### III.

The Speech or Debate Clause is deceptively simple: "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place." U.S. CONST. art. I, § 6, cl. 1. From this terse prohibition has emerged a somewhat complicated privilege, with several strands. Chief among these is the immunization from lawsuits, both civil and criminal. The Clause confers on Members of Congress immunity for all actions "within the 'legislative sphere,' even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan,* 412 U.S. 306, 312–13, 93 S.Ct. 2018, 2025, 36

L.Ed.2d 912 (1973) (internal citations omitted). The purpose of the protection "is to insure that the legislative function the Constitution allocates to Congress may be performed independently," without regard to the distractions of private civil litigation or the perils of criminal prosecution. *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 502, 95 S.Ct. 1813, 1820–21, 44 L.Ed.2d 324 (1975).

The Clause is not, to be sure, a blanket prohibition on suits against congressmen. It protects only those congressional acts properly thought to fall within the legislative function—those "generally done in a session of the House by one of its Members in relation to the business before it." *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1881). The Clause does not, for example, prevent the criminal prosecution of Members of Congress for misconduct, even if somehow connected with their performance of official responsibilities. *United States v. Brewster,* 408 U.S. 501, 512, 92 S.Ct. 2531, 2537, 33 L.Ed.2d 507 (1972) (citing *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966)). Malfeasance by a Member does not fall within the legislative sphere simply because it is associated with congressional duties. As the Supreme Court explained in allowing a bribery prosecution to go forward in *Brewster,* the constitutional protection for acts within the legislative sphere does not extend to "all conduct *relating* to the legislative process," 408 U.S. at 515, 92 S.Ct. at 2539, but only to those activities that are "clearly a part of the legislative process—the *due* functioning of the process," *id.* at 516.[5] This formulation, of course, implies that the judiciary cannot avoid determining what are the outer limits of legitimate legislative process. Accordingly, congressional complicity in a scheme to seize property illegally will undo any claim of immunity raised in a prosecution or civil action. *Dombrowski v. Eastland,* 387 U.S. 82, 84–85, 87 S.Ct. 1425, 1427–28, 18 L.Ed.2d

5. Nevertheless, the Clause restricts the manner in which such a prosecution can be conducted. Even when properly subject to suit, members of Congress are privileged against the evidentiary use against them of any legislative act, even if the act is not claimed to be itself illegal, but is

offered only to show motive, such as behavior in furtherance of a bribe. *See United States v. Helstoski,* 442 U.S. 477, 487–89, 99 S.Ct. 2432, 2438–40, 61 L.Ed.2d 12 (1979); *Brewster,* 408 U.S. at 527, 92 S.Ct. at 2544–45; *Johnson,* 383 U.S. at 169, 86 S.Ct. at 749.

577 (1967); *McSurely v. McClellan*, 553 F.2d 1277, 1287–88 (D.C.Cir.1976) (en banc), *cert. granted*, 434 U.S. 888, 98 S.Ct. 260, 54 L.Ed.2d 173 (1977), *cert. dismissed sub nom. McAdams v. McSurely*, 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978).

 The Speech or Debate Clause applies in civil cases as well as criminal prosecutions. *See, e.g., Eastland*, 421 U.S. at 502–03, 95 S.Ct. at 1820–21; *Dombrowski*, 387 U.S. at 84–85, 87 S.Ct. at 1427–28; *McMillan*, 412 U.S. at 312–13, 93 S.Ct. at 2024–25. Although the Clause "was not born primarily of a desire to avoid private suits," it was designed "to prevent intimidation by the executive and accountability before a possibly hostile judiciary," *Johnson*, 383 U.S. at 180–81, 86 S.Ct. at 755. The Clause states, after all, that Members shall not be called to account "in any other Place"—not just a criminal court. The prohibition of civil actions is consistent, moreover, with the objective of preserving legislative independence:

> [A] private civil action, whether for an injunction or damages, creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation. Private civil actions also may be used to delay and disrupt the legislative function. Moreover, whether a criminal action is instituted by the Executive Branch, or a civil action is brought by private parties, judicial power is still brought to bear on Members of Congress and legislative independence is imperiled.

*Eastland*, 421 U.S. at 503, 95 S.Ct. at 1821. As with criminal prosecutions, however, the privilege only bars civil suits when the action complained of falls within the legislative sphere. For example, although a congressman cannot be sued for defamatory statements made on the House floor, he has no claim to immunity for a libel action based on his subsequent republication of those statements outside Congress; those later expressions are no part of the "legislative process." *See Hutchinson v. Proxmire*, 443 U.S. 111, 127–28, 99 S.Ct. 2675, 2684–85, 61 L.Ed.2d 411 (1979); *see also Gravel v. United States*, 408 U.S. 606, 622–27, 92 S.Ct. 2614, 2625–28, 33 L.Ed.2d 583 (1972); *cf. McMillan*, 412 U.S. at 314–16 & nn. 8, 10, 93 S.Ct. at 2025–27 & nn. 8, 10 (1973); *McSurely*, 553 F.2d at 1285–86.

 The privilege also permits Congress to conduct investigations and obtain information without interference from the courts, at least when these activities are performed in a procedurally regular fashion. In *Eastland*, the Supreme Court refused to authorize injunctions against congressional subpoenas that sought access to the financial records of a group opposed to the Vietnam War. Although the subpoenas arguably infringed upon the association rights of the group's contributing members, *see National Ass'n for the Advancement of Colored People v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), they were nevertheless deemed closed to judicial inspection. The Court held that Congress was authorized to investigate any subject "on which legislation could be had," *Eastland*, 421 U.S. at 504 n. 15, 95 S.Ct. at 1822 n. 15, and that therefore its issuance of subpoenas necessarily fell within the legislative sphere. That Americans might suffer injustices (perhaps even unconstitutional ones) did not permit courts to scrutinize the purposes and methods of congressional inquiry. Rather, the legislative privilege is "absolute" where it applies at all. *Eastland*, 421 U.S. at 509, 95 S.Ct. at 1824. Those distressed by the investigation had no judicial remedy so long as Congress acted in a procedurally regular manner. "[R]isk of such abuse," the Court stated, "was 'the conscious choice of the Framers.'" *Id.* at 510, 95 S.Ct. at 1825.

 Closely related—indeed a corollary—to this right to pursue investigations is Congress' privilege to use materials in its possession without judicial interference. *McSurely*, 553 F.2d at 1295–96; *Dombrowski v. Burbank*, 358 F.2d 821, 823–24 (D.C.Cir. 1966) (dicta), *aff'd in part, rev'd in part*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967); *see also Hearst v. Black*, 87 F.2d 68, 71–72 (D.C.Cir.1936). In this context, the privilege operates to insulate materials held by Congress from claims based on actions or occurrences other than Congress' present use. In *McSurely*, we held *en banc* that the questionable provenance of documents or other mate-

rials was irrelevant to Congress' capacity to retain or make use of them. "The law is clear that even though material comes to a legislative committee by means that are unlawful or otherwise subject to judicial inquiry the subsequent use of the documents by the committee staff in the course of official business is privileged legislative activity." 553 F.2d at 1296–97. Although Members and (more likely) their agents can be held accountable for illegal seizures, *see Dombrowski,* 387 U.S. at 84–85, 87 S.Ct. at 1427–28; *McSurely,* 553 F.2d at 1294–96, that does not affect Congress' privilege to use illegally seized materials, so long as that use is consistent with legislative purposes.[6]

These background legal principles essentially are common ground between the parties.[7] Appellant claims, however, that the core purpose of the Clause is to protect congressmen from suit. Although the Clause has been extended to apply to efforts to compel congressmen to testify concerning legislative acts relevant in lawsuits brought against *third parties,* such an extension beyond the Clause's core purpose, appellant argues, must be carefully justified and weighed against countervailing interests. And the justification for this extension should be limited to those circumstances where a testimonial privilege is necessary to protect a congressman against a *hostile* confrontation which seeks to impugn his or her reputation, not just a situation where a congressman is inconvenienced by a court's request for the production of documents that had been given to the congressman or Congress by a third party. In this case neither Congressman Waxman's nor Congressman Wyden's behavior is challenged, only the actions of Williams who took the documents from the law firm. Moreover, that the documents are both stolen and privileged (attorney-client and work product) gives added force to appellant's

claim that the privilege was over extended by the district court.

The congressmen respond that the testimonial privilege is as extensive and as absolute as the privilege against suit. "In the absence of an independent unconstitutional act by the Subcommittee itself, the privilege accorded to Congress for its subcommittee's investigatory documents is preserved, regardless of B & W's separate claims against Williams." Appellees assert, somewhat half-heartedly, that B & W's claims that the documents are both stolen and privileged is "unproven," but, in any event, according to the Congressmen, that is irrelevant. Once the documents were received by Congress for legislative use—at least so long as congressmen were not involved in the alleged theft—an absolute constitutional bar of privilege drops like a steel curtain to prevent B & W from seeking discovery. As an added point, appellees assert that in this case Congressman Wyden promised the supplier of the document confidentiality, and therefore to permit B & W's discovery would "jeopardize" that promise. Such a decision would, according to the congressmen, necessarily "chill" Congress' ability to attract future confidential disclosures necessary for legislative purposes.

We think it is fair to assume on the record before us that the documents in question were in fact stolen (and that they were privileged).[8] Representative Waxman said as much during a radio interview. Under those circumstances, it seems more than a little strange for the district court and appellees to assert an interest in preventing a judicial ruling that would have a "chilling" affect. It cannot be seriously argued that we should wish to *encourage* Americans to steal other Americans' documents, or any other items, to be passed on to Congress.[9]

---

6. Uses that fall outside the confines of "legislative action," however—such as the dissemination of investigatory information outside Congress— are not protected. *McSurely,* 553 F.2d at 1285–86.

7. Except that appellant contends that civil actions are less of a constitutional concern than are criminal proceedings.

8. If this issue were seriously in dispute—and material—it surely follows that it would be inappropriate to affirm the district court, which did not make any finding as to whether the documents were stolen. We therefore do not understand why appellees even question B & W's assertion.

9. Compare Justice Stewart's dissenting opinion in *Gravel,* 408 U.S. at 631–32, 92 S.Ct. at 2645–46; *id.* at 662–64, 92 S.Ct. at 2643–44 (Brennan,

Putting the character of the documents to one side, however, we examine B & W's basic doctrinal argument—that the testimonial privilege is weaker than congressional immunity from suit. Looking only to the text of the Constitution, we would be inclined to conclude that, if anything, appellant has it backwards. The Clause says nothing specifically about lawsuits; what it does say is that members of Congress "shall not be *questioned* in any other place" about legislative actions. U.S. CONST. art. I, § 6, cl. 1 (emphasis added). Based on the text of the Constitution, it would seem that the immunity from suit derives from the testimonial privilege, not the other way around.

In any event, the Supreme Court recognized the testimonial privilege in *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), and we relied upon and elaborated its scope extensively in *MINPECO, S.A. v. Conticommodity Services, Inc.,* 844 F.2d 856 (D.C.Cir.1988). In the latter case, defendants in a civil action subpoenaed information and documents from a congressional subcommittee on the grounds that testimony contained in a subcommittee report (which they expected to be used against them at trial) did not accurately reflect the testimony actually given. They sought proof, in other words, that the subcommittee staff had falsified the report. Affirming the district court's decision to quash the subpoenas, we rejected the argument that the privilege "is available only if Congress can demonstrate that it faces the burden of defending a lawsuit that threatens an impermissible interference in congressional business by the judiciary." *Id.* at 859. The Speech or Debate Clause, we said, "cannot be limited by so artificial a line.... A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. *Discovery procedures* can prove just as intrusive." *Id.* (emphasis added).

In so holding, we adopted reasoning used by the Ninth Circuit in a similar case, *Miller v. Transamerican Press, Inc.,* 709 F.2d 524 (9th Cir.1983). In *Miller,* a plaintiff in an action against a third party sought to compel testimony from a former congressman about the circumstances of his placing materials in the Congressional Record some years earlier. (The statute of limitations barred any action against the congressman himself.) The Ninth Circuit thought that even though the subpoena would not interfere with current congressional activities, its enforcement would result in questioning as to a legislative act and would therefore be inconsistent with the Clause's concern with protecting congressional integrity. *Id.* at 528. That the Clause was being asserted in a purely testimonial context in no way limited its applicability. "Once the legislative-act test is met," the court held, "the privilege is absolute." *Id.* at 529 (citing *Eastland,* 421 U.S. at 503, 95 S.Ct. at 1821). We embraced the same principle in *MINPECO,* where we declared that since the subcommittee's inclusion of the allegedly altered testimony in a congressional report "was part of the legislative process," that was "the end of the matter"—the courts could not compel testimony over the assertion of the privilege. 844 F.2d at 861.

■ B & W claims that *MINPECO* and *Miller* do not control; the subpoenas at issue here are different from the discovery efforts in those earlier cases, because there the information sought would have impugned congressional "integrity" by showing that testimony had been altered before being published as reports, *see MINPECO,* 844 F.2d at 857–58, or that materials had been inserted into the Congressional Record for improper purposes, *see Miller,* 709 F.2d at 528. Here, by contrast, the subpoenas are said to be entirely neutral as to congressional conduct; all that is sought is access to appellant's own documents. It is a clever effort to escape the damaging precedent by focusing on one meaning of the word "integrity," but it does not work. When the Supreme Court earlier stated that the purpose of the Clause is to protect the "integrity of the legislative process," *Brewster,* 408 U.S. at 507, 517, 92 S.Ct. at 2535, 2540, the word "integrity" was being used by the Supreme Court as it was by us in *MINPECO,* not in the sense of "reputation

J., dissenting); *see also McSurely,* 553 F.2d at 1286–94; *id.* at 1303 (Wilkey, J., dissenting)

(agreeing as to principle, but disagreeing as to its application).

for rectitude" but rather in the sense of "a state of being unimpaired." The privilege is not designed to protect the reputations of congressmen but rather the functioning of Congress. In *MINPECO* we were not concerned with Congress' image, but only with its capacity to function effectively if beset by third-party discovery requests. *See* 844 F.2d at 859–61. The same is true for *Miller. See* 709 F.2d at 529. In both cases the only question was whether the subpoenas inquired into legislative conduct. *See MINPECO*, 844 F.2d at 862 (quoting *Miller*, 709 F.2d at 529); *see also Eastland*, 421 U.S. at 503, 95 S.Ct. at 1821 ("[O]nce it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference.") (citing *McMillan*, 412 U.S. at 314, 93 S.Ct. at 2025–26). Contrary to appellant's reading, the purposes behind the subpoenas—or their potential for embarrassment, if enforced—were irrelevant to the holding in either case.

■■■ B & W does concede that a "second purpose" of the Clause is "to prevent intrusions into the legislative process," but assures us that its request to inspect and copy its documents is "the least intrusive means" of obtaining the information that it seeks. That appellant has devised the "least intrusive means" does not, of course, establish its right to make the request in the first place; nor does it render the request unobtrusive. Appellant's subpoena might well be less onerous than the one rejected in *MINPECO* (where all internal documents, correspondence, and communications relating to the disputed testimony were sought), but that is of no particular significance. The degree of disruption is immaterial. In *MINPECO* too it was claimed that any distraction would be slight, but we held that an approach to the Clause that would require "an initial judicial inquiry ... to calibrate the degree to which [a subpoena's] enforcement would burden the committee's work" would be "absurd." 844 F.2d at 860. In short, any probing of legislative *acts* is sufficient to trigger the immunity.

To be sure, as appellant emphasizes, *Gravel*, although recognizing the testimonial privilege, held that a Senator's aide (or the Sena-

tor) could be questioned before a grand jury regarding the provenance of classified Defense Department documents—the Pentagon Papers—that had come into Senator Gravel's possession (and which he had entered into the record during a midnight meeting of the Buildings and Grounds Subcommittee of the Senate Public Works Committee). 408 U.S. at 609, 92 S.Ct. at 2619. The Speech or Debate Clause, the Court determined, privileged the Senator (and his aides) against testifying as to legislative acts, even with respect to potential wrongdoing by third parties. *See id.* at 616–22, 92 S.Ct. at 2622–26. But the Court did not "perceive any constitutional or other privilege" standing in the way of "grand jury questions relevant to tracing the source of obviously highly classified documents that came into the Senator's possession and are the basic subject matter of the inquiry." *Id.* at 628, 92 S.Ct. at 2628. From this case appellant argues that, at least, the testimonial privilege does not categorically bar efforts to discover the *source* of documents that Congress has obtained.

We think that is a vast overreading of *Gravel;* if that were so, any person facing the prospect of testimony before Congress could initiate discovery proceedings to reach documents that Congress had not prepared itself. *That* certainly would "chill" any congressional inquiry; indeed, it would cripple it. It should first be noted that in parsing *Gravel* the questioning allowed by the Supreme Court was part of a grand jury investigation—a factor the Court repeatedly emphasized. *See id.* It does not necessarily follow from *Gravel* that the same rule would apply to similar efforts stemming from a civil action brought by a third party. Although a distinction between civil and criminal does not really square with the Court's statements in *Eastland* that the Clause's prohibition, when applicable, is "absolute," *Eastland* was decided after *Gravel*, and certainly took into account the prior opinion's regard for the significance of "trials or grand jury proceedings involving third-party crimes," *Gravel*, 408 U.S. at 622, 92 S.Ct. at 2625. *see also id.* at 628, 92 S.Ct. at 2628–29. *Gravel's* sensitivities to the existence of criminal proceedings against persons other than Members of Congress at least suggest that the testimoni-

**420**

al privilege might be less stringently applied when inconsistent with a sovereign interest, but is "absolute" in all other contexts.

Still, the Third Circuit has also read *Gravel* and the Clause in a fashion that, at least in part, supports appellant. *In re Grand Jury Investigation*, 587 F.2d 589 (3d Cir.1978). There the court decided that when the Clause is invoked as a bar to discovery of documentary materials the availability of the privilege depends on the purposes for which the information is sought. *See id.* at 595. The "documents" at the center of that case were telephone toll records which had been subpoenaed from the Clerk of the House in the course of a grand jury investigation into illegal actions on the part of a congressman. The court believed that

> to the extent that the Speech or Debate Clause creates a *testimonial* privilege as well as a *use* immunity, it does so only for the purpose of protecting the legislator . . . from the harassment of hostile questioning. It is not designed to encourage confidences by maintaining secrecy, for the legislative process in a democracy has only a limited toleration for secrecy. *See U.S. Const.* art. I, § 5, cl. 3.

*Id.* at 597.

From this understanding, the Third Circuit reasoned that the Speech or Debate Clause privilege "when applied to records or third-party testimony is one of nonevidentiary use, not of nondisclosure." *Id.* (citing *United States v. Helstoski*, 576 F.2d 511, 523 (3d Cir.1978), *aff'd*, 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979)); *see also In re Grand Jury Proceedings (Cianfrani)*, 563 F.2d 577 (3d Cir.1977). Accordingly, it held that although toll records of telephone calls relevant to "legislative acts" could not be used as evidence before the grand jury, the privilege did not bar the U.S. Attorney from taking part in proceedings *in camera* to determine which telephone calls corresponded to "legislative acts." B & W urges us to join

the Third Circuit in holding that even though the Speech or Debate Clause bars the use of documents as *evidence* against Members, it does not privilege them against "discovery"—and thus does not justify congressional refusals to disclose.

■ We do not accept the proposition that the testimonial immunity of the Speech or Debate Clause only applies when Members or their aides are personally questioned. Documentary evidence can certainly be as revealing as oral communications—even if only indirectly when, as here, the documents in question (unlike those in *Grand Jury Investigation*) do not detail specific congressional actions. But indications as to what Congress is looking at provide clues as to what Congress is doing, or might be about to do—and this is true whether or not the documents are sought for the purpose of inquiring into (or frustrating) legislative conduct or to advance some other goals, such as those claimed by B & W here. We do not share the Third Circuit's conviction that democracy's "limited toleration for secrecy" is inconsistent with an interpretation of the Speech or Debate Clause that would permit Congress to insist on the confidentiality of investigative files. To the extent that the Third Circuit has adopted a special rule for the testimonial use of documents, we therefore disagree. None of the Supreme Court's opinions acknowledges such a distinction. Indeed, the only authority upon which the Third Circuit relied in adopting its approach is the Constitution's (somewhat distant) direction that each House keep a "Journal of its Proceedings," U.S. Const. art. I, § 5, cl. 3, but we do not read that provision as having any bearing on the applicability of the Speech or Debate Clause privilege to documentary materials, *cf. id.* ("excepting such Parts as may in their Judgment require Secrecy").[10]

Be that as it may, our own circuit precedent precludes our making this distinction

---

10. We are not convinced that the Third Circuit would enforce the subpoenas at issue here. Here, Congress is asserting the privilege as to matters that it holds confidential—the content of its files—whereas in *Grand Jury Investigation*, the subpoenas sought the production of materials that were also possessed by third parties. *Cf.*

587 F.2d at 595. Moreover, the court's disquiet over congressional claims to secrecy was animated by the countermanding sovereign interest in criminal law enforcement that was present in that case, as in *Gravel*. We doubt whether it would take the same dim view of assertions of the privilege against private parties.

between documentary and oral testimony. It will be recalled that in *MINPECO*, documents had been sought for solely testimonial purposes (*i.e.*, not for use as evidence against Congress or any of its Members), and yet we held that the Speech or Debate Clause barred enforcement of the subpoenas *duces tecum*. *See* 844 F.2d at 859–60. That holding, it bears repeating, was premised on the notion that the Speech or Debate Clause serves to insulate Members of Congress from distractions that "divert their time, energy, and attention from their legislative tasks." *Id.* at 859 (quoting *Eastland*, 421 U.S. at 503, 95 S.Ct. at 1821). Obviously, the nature of the use to which documents will be put—testimonial or evidentiary—is immaterial if the touchstone is interference with legislative activities. That is the rationale attributed to the Clause in our most apposite precedents, and it necessarily governs our decision today.

 To sum up, we do not agree with appellant's doctrinal approach to the Speech or Debate Clause.[11] A party is no more entitled to compel congressional testimony—or production of documents—than it is to sue congressmen. We do not perceive a difference in the vigor with which the privilege protects against compelling a congressman's testimony as opposed to the protection it provides against suit. *Gravel* permitted the tracing of allegedly classified documents in the possession of the Senator and his aides because, as the Court said:

> no prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen. Neither they nor their aides should be immune from liability or questioning in such circumstances. Such acts are no more essential to legislating than the conduct held unprotected in

*United States v. Johnson*, 383 U.S. 169 [86 S.Ct. 749, 15 L.Ed.2d 681] (1966).

*Gravel*, 408 U.S. at 621, 92 S.Ct. at 2625. Thus, documents or other material that comes into the hands of congressmen may be reached either in a direct suit or a subpoena only if the circumstances by which they come can be thought to fall outside "legislative acts" or the legitimate legislative sphere.

 In this regard, we turn back to the character of the documents in question here. Appellant's claim, as we understand it, is that Congress' use of documents obtained through theft is no part of any legitimate legislative activity. The point is a subtle one. Appellant does not accuse Congress of complicity in any illegality. Rather, B & W asserts—and the argument has some appeal—that there are procedures available to Congress through which it generally is presumed to operate. The legislature has broad investigatory authority, including the subpoena power, and Congress certainly could have sought the documents from B & W directly. But had it done so, the argument runs, appellant would at least have had an opportunity to raise its privilege claim. *Cf. United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). Since there are mechanisms through which Congress could have attempted to obtain these documents consistent with the rule of law, the means by which it operated in this case cannot be thought "essential to legislating." *Gravel*, 408 U.S. at 621, 92 S.Ct. at 2625; *cf. Brewster*, 408 U.S. at 515–16, 92 S.Ct. at 2539 (privilege does not cover "all conduct *relating* to the legislative process" only acts that are part of "the *due* functioning of the process" (footnotes omitted)). As noted, the congressmen respond to this argument with an argumentative stonewall. Unless the congressmen are responsible for gaining the material through unconstitutional means an American who wishes access is just out of luck. We are not prepared to accept that argument—that once

11. Appellant also argues that the privilege does not apply because it was waived by Representative Waxman by virtue of his statements made during a radio broadcast interview. In the interview he stated that the Subcommittee had received documents, apparently stolen, from a law office that represented B & W. This statement is

certainly not sufficient to support a finding of any waiver of the Speech or Debate clause privilege. *Cf. Helstoski*, 442 U.S. at 490–91, 99 S.Ct. at 2440 (waiver of immunity against prosecution, if possible, requires "explicit and unequivocal renunciation of the protection").

stolen and privileged ·property passes into the legislative maw it can no longer be recovered. We very much doubt that Congress can with impunity appropriate Americans' private property or maintain possession of any and all privileged documents. (Suppose, for instance, the psychiatrist's records of an unpopular figure, facing legislative inquiry, were stolen by a third party and passed on to a congressional committee.) [12] Indeed, it may even be that congressmen could be prosecuted for knowing receipt of stolen property—which after all is a crime in most jurisdictions. Still, it does not seem to us that the quality of documents or material that Congress receives has the same character regardless of who seeks their return (or discovery). Surely the American Tobacco Company, General Motors, or Common Cause would not assert the privileged or stolen nature of the documents involved in this case as a basis for subpoenaing them. That suggests that in asking whether the documents were obtained in a fashion that should be thought to fall outside a legislative act we must bear in mind that the answer could be different depending on who seeks the documents, and with what legal claim to entitlement.

The difficulty with appellant's position is the lack of a connection between the alleged stolen or privileged nature of the documents and the remedy it seeks. B & W has not shown how copying the documents would advance either its property or privilege interest. Even if it had, B & W might be obliged to pursue other remedies before seeking to

interfere with Congress' use, but it is unnecessary to decide that here.

B & W claims (in a footnote in its brief) that it wishes to copy the documents as an aid to its lawsuit against Williams "to prove damages ... to preserve its privilege claims and to ascertain exactly which documents were stolen by Williams." We find B & W's proffer quite unpersuasive. B & W has conceded that the identity of the intermediary who delivered the documents to Congress is no longer at issue; a plaintiff's lawyer, Richard Scruggs, has come forward as the source. Moreover, the documents were apparently supplied to various media and academic institutions so we cannot conceive of how copies of the exact documents supplied to Congress can possibly be relevant to damages. If congressional legislative action were to be considered an element of damages (which we very much doubt) surely it is enough to establish that Congress received some of the documents which is not really in dispute.[13]

Nor has B & W explained how the opportunity to review the documents relates in any way to appellant's desire to "preserve its privilege claims." We do not understand how its request—to be allowed to *copy* the documents—bears on its capacity to assert whatever attorney-client or work-product privilege may be inherent in those materials. If in some future litigation it becomes important for B & W to demonstrate that it never waived its privilege, it would certainly suffice, as regards to the documents in Congress' possession, that it took affirmative steps to secure them. B & W does not itself need to gain access to preserve its privilege. It must

**12.** We can imagine some rather difficult hypotheticals involving tension between Congress' right to "use" any such materials and a person's property right or the protection of doctor-patient privileged material. Both interests might be accommodated under certain circumstances. For instance, suppose a business' documents, of which it has no copies, are stolen and given to Congress. If the business later needs the information that these documents contain it would have a strong claim for obtaining copies of the documents but not *necessarily* the originals. The harm that is caused by Congress retaining the stolen documents, the business' lack of the needed information contained in the documents, can be remedied by simply allowing the business to obtain copies. Congress could continue to keep the originals. Of course, one could construct

other scenarios where the harm caused by Congress retaining stolen documents might not be so easily remedied. In any event, the remedy must be connected to the harm caused by Congress' retention of stolen documents. It follows that the remedy does not necessarily have to take the form of a return of the actual property.

**13.** Theoretically—but we think only theoretically—the amount of damages could depend on exactly which of B & W's documents were turned over to Congress. Appellant would have had to spell that out quite precisely, however, to oblige us to decide such a difficult constitutional issue. Moreover, B & W has given us no reason to believe that they could not obtain this information in another way.

merely attempt to prevent others from doing so. (Of course our decision today, which is limited to discussing Congress' Speech or Debate Clause privilege, in no way reflects on B & W's own privileges with respect to any of its documents, stolen or otherwise, in Congress' possession.)

B & W's final justification for its subpoenas is that they are necessary to "authenticate the documents discussed in the media." Whatever this means (and we have no idea), we do not see how it relates to examination of the documents in the possession of *Congress*. Appellant has never maintained that it lacks the originals of the documents that Williams allegedly copied and disseminated. Presumably, it could "authenticate" any of the statements contained in press reports by investigating its own files.[14]

 The stolen or privileged character of the documents is irrelevant to the constitutional issue before us. If this were merely a straight discovery effort—to reach documents in Congress' possession for a private purpose—we doubt whether appellant would even seriously argue that the privilege would not attach. At oral argument, however, appellant urged that we not focus on appellant's purpose in seeking discovery; if that was unclear in the record, the case should be remanded to the district court. We think, however, we are entitled to examine appellant's proffer because it bears so directly on the relevance of the character of the documents to appellant's claim. And the proffer on its own terms simply does not

establish that relevance. For that reason, B & W must be regarded as no different than any other plaintiff in a third party lawsuit who sought to discover the documents. We therefore believe it unnecessary to decide whether Congress may invoke the Speech or Debate Clause to protect stolen property against a rightful owner or to "use" privileged documents in the same manner as any other material that comes into its possession. B & W's claim at bottom, is to a right to engage in a broad scale discovery of documents in a congressional file that comes from third parties. The Speech or Debate Clause bars that claim.[15]

\* \* \* \* \* \*

Although we affirm the district court, fairness obliges us to disassociate ourselves from comments the district judge made in his opinion concerning his views as to the likely content of the documents in question (which neither he nor we have seen) and B & W's motivation in seeking the subpoenas. The products of major American tobacco companies—indeed their very existence—is at the heart of one of the more contentious political issues of our time. As federal judges we wish to make clear that we are not taking sides on this political issue.

---

14. We also note that B & W has the benefit of subpoenas issued directly to various press agencies themselves. The best way to "authenticate" the papers relied upon by the media is by examining the versions in the media's possession. We offer no view, of course, as to B & W's rights to enforce such subpoenas or the privileges, if any, that might be asserted in response.

15. We reject the district court's alternative ground for its holding—that the Supremacy

Clause itself bars the issuance of subpoenas to Members of Congress. *Maddox v. Williams*, 855 F.Supp. 406, 413–15 (D.D.C.1994). This claim apparently was not even raised by appellees, who here cannot bring themselves to argue a point upon which they prevailed below. They *concede* that "the Supremacy Clause is not an independent basis for asserting substantive constitutional rights."