# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 24, 2021        Decided June 4, 2021

No. 20-5270

JUDICIAL WATCH, INC.,
APPELLANT

v.

ADAM B. SCHIFF, CHAIRMAN, U.S. HOUSE PERMANENT
SELECT COMMITTEE ON INTELLIGENCE, AND U.S. HOUSE
PERMANENT SELECT COMMITTEE ON INTELLIGENCE,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03790)

*James F. Peterson* argued the cause and filed the briefs for appellant.

*Todd B. Tatelman*, Principal Deputy General Counsel, U.S. House of Representatives, argued the cause for appellee. With him on the brief was *Douglas N. Letter*, General Counsel.

Before: HENDERSON, ROGERS and WILKINS, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Opinion concurring in the judgment by *Circuit Judge* HENDERSON.

ROGERS, *Circuit Judge*:  Judicial Watch, Inc. filed a lawsuit against the House Permanent Select Committee on Intelligence and its chairman Adam B. Schiff seeking disclosure of all subpoenas issued to any telecommunications provider as a part of the Committee's impeachment inquiry into President Donald J. Trump, as well as the responses to those subpoenas.  Because the Speech or Debate Clause of the United States Constitution bars this lawsuit, the district court's dismissal of the case for lack of subject-matter jurisdiction is affirmed.

**I.**

On September 24, 2019, the Speaker of the House announced that the House of Representatives would proceed with its impeachment inquiry into President Donald J. Trump. *See* Press Release, Speaker Nancy Pelosi, Pelosi Remarks Announcing Impeachment Inquiry (Sept. 24, 2019), https://www.speaker.gov/newsroom/92419-0.  On or around September 30, 2019, the Committee issued a subpoena to the telecommunications provider AT&T, Inc. for certain records. *See* Compl. ¶ 8; Oral Arg. Trans. 11.

A month later, on October 31, 2019, the full House adopted Resolution 660.  As relevant, the Resolution established procedures for the Committee to continue its impeachment inquiry, including for the issuance of subpoenas, and required the Committee to issue a report setting forth its findings and any recommendations to the Committee on the Judiciary. *See* H.R. Res. 660, 116th Cong. (2019). Apparently, the Committee subsequently issued additional subpoenas to

other telecommunications providers. *See* Appellees Br. 4; *see also* Oral Arg. Trans. 3.

In early December 2019, the Committee published its Report, which contained some information obtained in response to its subpoenas to telecommunications providers. *See* H. Rep. 116-335, TRUMP-UKRAINE IMPEACHMENT INQUIRY REPORT (Dec. 2019). For instance, the Report references document productions from AT&T, Inc. that apparently included records of phone calls involving private individuals. *See*, *e.g.*, *id*. at 47 nn.82–85.

Shortly thereafter, on December 6, 2019, Judicial Watch, Inc. submitted a request to the Committee and its chairman for copies of:

1. All subpoenas issued by the House Permanent Select Committee on Intelligence on or about September 30, 2019 to any telecommunications provider including, but not limited to AT&T, Inc., for records of telephone calls of any individuals;

2. All responses received to the above-referenced subpoenas.

Compl. ¶ 8. The request asked for the records or a response indicating whether the Committee and its chairman intended to comply with the request by December 18, 2019. *Id.* ¶ 9.

After neither the Committee nor its chairman acceded or responded by that date, Judicial Watch filed the instant lawsuit in the U.S. district court, alleging that the failure to release the requested records violated the common-law right of public access to government records. *See id*. ¶¶ 13–21. The district court dismissed the case for lack of subject-matter jurisdiction,

concluding that the Speech or Debate Clause and sovereign immunity barred Judicial Watch's lawsuit. *See Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 309–19 (D.D.C. 2020). Judicial Watch appeals, and our review is *de novo*. *See Rangel v. Boehner*, 785 F.3d 19, 22 (D.C. Cir. 2015).

**II.**

The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. CONST. art. I, § 6, cl. 1. Its purpose is "to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process." *United States v. Brewster*, 408 U.S. 501, 524 (1972). It "serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) (quoting *United States v. Johnson*, 383 U.S. 169, 178 (1966)).

"The Supreme Court has consistently read the Speech or Debate Clause 'broadly' to achieve its purposes." *Rangel*, 785 F.3d at 23 (quoting *Eastland*, 421 U.S. at 501). Thus, the Clause provides immunity from both criminal and civil suits. *See Eastland*, 421 U.S. at 502–03. And although it speaks of "Speech or Debate," it extends to protect all "legislative acts." *Doe v. McMillan*, 412 U.S. 306, 312 (1973) (internal citation omitted). As to the Clause's reach, the Supreme Court has explained:

> The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which

> Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel v. United States*, 408 U.S. 606, 625 (1972).

Here, the Committee's issuance of subpoenas, whether as part of an oversight investigation or impeachment inquiry, was a legislative act protected by the Speech or Debate Clause. "Issuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate," *Eastland,* 421 U.S. at 504, and that power "plainly falls within the test for legislative activity announced in *Gravel*," *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (internal quotation marks and citation omitted). Furthermore, because the Constitution gives the House of Representatives the sole power of impeachment, U.S. CONST. art. I, § 2, cl. 5, subpoenas issued as part of an impeachment inquiry constitute an "integral part of the deliberative and communicative processes" with respect to a matter that "the Constitution places within the jurisdiction of either House," *Gravel*, 408 U.S. at 625.

As precedent makes clear, none of Judicial Watch's counterarguments have merit. That its lawsuit seeks "only the disclosure of public records," rather than to establish criminal or civil liability, does not render the Speech or Debate Clause inapplicable. Appellant Br. 10. To the contrary, Judicial Watch "is no more entitled to compel . . . production of documents . . . than it is to sue congressmen." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 (D.C. Cir. 1995). To the extent Judicial Watch maintains that "legislative independence is not at issue in this case" because it seeks "public records that are not confidential in nature," it

misunderstands the immunity afforded by the Speech or Debate Clause. Appellant Br. 10–11. Notwithstanding the records' confidentiality, "legislative independence is imperiled" when a "civil action . . . creates a distraction and forces [congressmen] to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Eastland,* 421 U.S. at 503; *see Brown & Williamson Tobacco Corp.*, 62 F.3d at 415.

Equally unavailing is Judicial Watch's contention that the Committee's subpoenas "served no legitimate legislative purpose" and were therefore unprotected by the Speech or Debate Clause. Appellant Br. 12. According to Judicial Watch, the subpoenas were "too tangential to the purpose of an impeachment inquiry" because they sought "call records of private citizens who cannot be impeached and who are accused of no offense." *Id*. at 14; *see also* Reply Br. 10–11. Conversely, the Committee states that the subpoenas "played a critical role in furthering [its] inquiry, not only in corroborating witness testimony, but also by filling numerous factual gaps." Appellees Br. 19. As to the propriety of subpoenaing specific call records, the court's "scope of inquiry" is "narrow." *Eastland*, 421 U.S. at 506; *see also McSurely*, 553 F.2d at 1036. "The wisdom of congressional approach or methodology is not open to judicial veto." *Eastland*, 421 U.S. at 509. "Nor is the legitimacy of a congressional inquiry to be defined by what it produces." *Id*. Given these principles, and based on the record, the unsupported objections to the relevance of the information sought by the Committee's subpoenas fail.

Finally, Judicial Watch's contention that the Committee's subpoenas "are outside the ambit of the Speech or Debate Clause because they were issued contrary to the rules of both the House and [the Committee]" also fails. Appellant Br. 15. "An act does not lose its legislative character simply because a plaintiff alleges that it violated the House Rules." *Rangel*, 785

F.3d at 24 (citing *Kilbourn v. Thompson*, 103 U.S. 168, 203 (1880)). Moreover, as the Committee notes, Judicial Watch fails to show that the issuance of the subpoenas in fact violated congressional rules. *See* Appellees Br. 21–22.

Today, the court has no occasion to decide whether the Speech or Debate Clause bars disclosure of public records subject to the common-law right of access in all circumstances. Nor need it consider whether and how the application of the Clause relates to the two-step inquiry to determine whether the common-law right of access applies. *See Washington Legal Found. v. U.S. Sent'g Comm'n,* 17 F.3d 1446, 1451 (D.C. Cir. 1994). The parties did not raise, and our precedent does not address those issues.

Because the Speech or Debate Clause bars Judicial Watch's lawsuit, the court need not address the district court's alternative ground for dismissal based on the doctrine of sovereign immunity. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp*., 549 U.S. 422, 431 (2007). Accordingly, we remand the case to the district court to dismiss the complaint without prejudice inasmuch as the dismissal is for want of subject-matter jurisdiction. *See North American Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020); *Howard v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 941 (D.C. Cir. 2013).

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in the judgment: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. . . . [A] people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Letter from James Madison to W. T. Barry (Aug. 4, 1822), *in* 9 The Writings of James Madison 103 (Gaillard Hunt ed. 1910).

I agree with my colleagues that, under our precedent, the Speech or Debate Clause of the United States Constitution bars Judicial Watch's lawsuit. But I join in the judgment only; I believe, in the right case, the application of the Speech or Debate Clause to a common law right of access claim would require careful balancing, as discussed *infra* at 6–12.

## I.

"In 'the courts of this country'—including the federal courts—the common law bestows upon the public a right of access to public records and documents." *Wash. Legal Found. v. U.S. Sent'g Comm'n* (*WLF II*), 89 F.3d 897, 902 (D.C. Cir. 1996) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)). In *Nixon*, "the Supreme Court was unequivocal in stating that there is a federal common law right of access 'to inspect and copy public records and documents.'" *Id.* (quoting *Nixon*, 435 U.S. at 597). "[T]he general rule is that all three branches of government, legislative, executive, and judicial, are subject to the common law right." *Id.* at 903 (quoting *Schwartz v. U.S. Dep't of Just.*, 435 F. Supp. 1203, 1203 (D.D.C. 1977)). The right of access is "a precious common law right . . . that predates the Constitution itself." *United States v. Mitchell*, 551 F.2d 1252, 1260 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978).

The common law right of access "is fundamental to a democratic state." *Id.* at 1258; *cf. Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884) (Holmes, J.) ("[I]t is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed."). "Like the First Amendment, then, the right of inspection serves to produce 'an informed and enlightened public opinion.'" *Mitchell*, 551 F.2d at 1258 (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 247 (1936)).

We have recognized that "openness in government has always been thought crucial to ensuring that the people remain in control of their government." *In re Sealed Case*, 121 F.3d 729, 749 (D.C. Cir. 1997). "Neither our elected nor our appointed representatives may abridge the free flow of information simply to protect their own activities from public scrutiny. An official policy of secrecy must be supported by some legitimate justification that serves the interest of the public office." *Press-Enter. Co. v. Superior Ct. of Cal. for Riverside Cty.*, 478 U.S. 1, 19 (1986) (Stevens, J., dissenting). In the analogous Freedom of Information Act (FOIA) context, the United States Supreme Court has made clear that citizens "know[ing] 'what their Government is up to' . . . [is] a structural necessity in a real democracy." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (quoting *U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).[1]

---

[1] *See also Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 259 (D.C. Cir. 1977) ("The exemptions from the mandatory disclosure requirement of the FOIA are both narrowly drafted and narrowly construed in order to counterbalance the self-protective instincts of the bureaucracy which, like any organization,

We have never considered the Speech or Debate Clause's application to a common law right of access claim and the parties simply cite a single district court case where the two doctrines were raised, *Pentagen Technologies International v. Committee on Appropriations of the United States House of Representatives*, 20 F. Supp. 2d 41 (D.D.C. 1998), *aff'd*, 194 F.3d 174 (D.C. Cir. 1999) (unpublished table decision).[2] In *Pentagen Technologies*, the plaintiffs brought a common law right of access claim against the Committee on Appropriations of the United States House of Representatives, seeking "to review and copy a series of investigative reports" that were not released to the public. 20 F. Supp. 2d at 42. The Committee on Appropriations asserted the reports were protected from disclosure by the Speech or Debate Clause. *Id.* at 43. Although the district court "conclude[d] that investigative reports [were] protected from compulsory disclosure by the Speech or Debate Clause," it reached that conclusion only *after* determining that the investigative reports were "not 'public records' as defined by *WLF II*" and that "[t]here thus exist[ed] no common law right of access to the reports." *Id.* at 45. If the Speech or Debate Clause in fact provided absolute protection from disclosure—including protection from a common law right of access claim—the district court's "public records" analysis would have been unnecessary.

---

would prefer to operate under the relatively comforting gaze of only its own members rather than the more revealing 'sunlight' of public scrutiny.").

[2] Although we affirmed the district court's judgment in *Pentagen Technologies*, we did not reach the merits. *Pentagen Techs. Int'l v. Comm. on Appropriations of U.S. House of Representatives*, 194 F.3d 174, 174 (D.C. Cir. 1999) (unpublished table decision). We addressed only the appellants' reconsideration motion and determined the district court did not abuse its discretion in denying reconsideration. *Id.*

4

**II.**

We have set forth a two-step inquiry to determine whether the common law right of access applies. *Wash. Legal Found. v. U.S. Sent'g Comm'n* (*WLF I*), 17 F.3d 1446, 1451–52 (D.C. Cir. 1994). First, a court must decide "whether the document sought is a 'public record,'" *id.* at 1451, and, if it is, "the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure," *id.* at 1451–52; *see also WLF II*, 89 F.3d at 899 (summarizing earlier holding).

**A.**

A "public record" subject to the common law right of access "is a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *WLF II*, 89 F.3d at 905. The district court concluded that the subpoenas issued by the House Permanent Select Committee on Intelligence (Committee) do not fall within this definition of "public record." *Jud. Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 315 (D.D.C. 2020). The district court was plainly incorrect; the subpoenas are "public records."[3]

---

[3] The district court appropriately concluded that the responses to the Committee subpoenas are not "public records" because the records belong to a telecommunications provider, not a government entity. *Schiff*, 474 F. Supp. 3d at 315 n.4; *see SEC v. Am. Int'l Grp.*, 712 F.3d 1, 5 (D.C. Cir. 2013) ("Documents created by the independent consultant are not government documents" and therefore not "public records" subject to the common law right of access because "a transfer of possession [to the government] is not itself sufficient to render them public records"). As discussed *infra*,

5

We have determined the definition of "public record" is "narrow enough to avoid the necessity for judicial application of the second-step balancing test to documents that are preliminary, advisory, or, for one reason or another, do not eventuate in any official action or decision being taken." *WLF II*, 89 F.3d at 905. The district court concluded that the Committee's "issuance of the requested subpoenas was just such a preliminary step to gather information pertinent to the Committee's task of deciding whether to recommend impeachment of the President and thus the subpoenas do not qualify as public records subject to the common-law right of public access." *Schiff*, 474 F. Supp. 3d at 315–16. But there is nothing "preliminary" about a subpoena issued by the Congress—it is an "official action" that constitutes a "matter of legal significance, broadly conceived." *WLF II*, 89 F.3d at 905; *see* Appellant Br. 6 ("the subpoenas requested here are formal legal commands issued to third parties").

The potential consequences for failure to comply with a Congressional subpoena lay bare the difference, in the context of the "public record" definition, between a subpoena and preliminary draft materials like those at issue in *WLF II* and *Pentagen Technologies*. The disputed documents in *WLF II* and *Pentagen Technologies*—preliminary drafts and internal investigative memoranda prepared at the request of a government decisionmaker—carried no independent legal significance. *See WLF II*, 89 F.3d at 906 ("each category of documents is made up entirely of materials that are, if not preliminary, then merely incidental to the only official action the [government entity] was authorized to take"). In contrast, failure to comply with a Congressional subpoena may result in contempt proceedings whether or not the Committee ultimately

however, the Committee subpoenas are plainly "public records" subject to the common law right of access.

takes action. *See Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821) (Congress's inherent contempt power); 2 U.S.C. §§ 192, 194 (criminal contempt statute to enforce Congressional subpoenas).

Moreover, as the district court recognized, "[t]he requested subpoenas were issued by [the Committee] and in this respect certainly reflect an official action." *Schiff*, 474 F. Supp. 3d at 315. Indeed, the Committee asserts that the subpoenas were issued in accordance with House Rules. *See* Appellee Br. 21–22 (citing House Rules XI.2(m)(1)(B), XI.2(m)(3)(A)(i) and Rules of the Permanent Select Comm. on Intelligence, Rule 10(b)). And, although we do not have access to the subpoenas at issue, other Committee subpoenas related to the impeachment inquiry that have been released to the public, *see infra* at 10 n.6, were all issued on the official letterhead of the Congress of the United States and signed by the chairmen of three House committees.

Simply put, the issuance of a Congressional subpoena is an "official action" and the subpoena itself "record[s] a[] . . . matter of legal significance, broadly conceived." *WLF II*, 89 F.3d at 905. It is therefore a "public record" subject to the common law right of public access.

**B.**

Although its subpoena is a "public record," the Committee "could still avoid disclosure if its 'specific interests favoring secrecy outweigh the general and specific interests favoring disclosure.'" *WLF I*, 17 F.3d at 1451 (quoting *Mokhiber v. Davis*, 537 A.2d 1100, 1108 (D.C. 1988)). The second-step balancing test "focus[es] on the specific nature of the governmental and public interests as they relate to the document itself, as well as the general public interest in the openness of governmental processes." *Id.* at 1452.

We have never applied the second-step balancing test to a common law right of access claim seeking non-judicial records. As we noted in *WLF II*, "when we look for guidance concerning the application of this right[,] we find that we are in uncharted waters." *WLF II*, 89 F.3d at 903; *cf. Nixon*, 435 U.S. at 598–99 ("It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate").

For judicial records, we have weighed the public's and the government's competing interests by applying the *Hubbard* factors:

> (1) [T]he need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.

*In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1131 (D.C. Cir. 2020) (quoting *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017)); *see also United States v. Hubbard*, 650 F.2d 293, 317–22 (D.C. Cir. 1980). The first five *Hubbard* factors provide helpful guidance for balancing the interests at stake here as well.

First, "the general public interest in the openness of governmental processes" weighs in favor of disclosure because

the right of access is fundamental to our democracy. *WLF I*, 17 F.3d at 1452. The importance of the general public interest should be clear from the foregoing discussion. *See supra* at 1–3. As with a judicial record, there should be a "strong presumption" in favor of disclosing a Congressional subpoena. *See In re Leopold*, 964 F.3d at 1127 (quoting *Hubbard*, 650 F.2d at 317).

Moreover, the public has a strong interest in the subpoenas at issue. Specifically, on the public's "side of the scales is the incremental gain in public understanding of an immensely important historical occurrence that arguably would flow from the release" of the subpoenas. *Nixon*, 435 U.S. at 602. Before it did so regarding President Trump, the House had pursued impeachment investigations into only three Presidents in the history of our nation—President Andrew Johnson, President Nixon and President Clinton.[4] "Public confidence in a procedure as political and public as impeachment is an important consideration justifying disclosure." *In re Comm. on the Judiciary, U.S. House of Representatives*, 951 F.3d 589, 601 (D.C. Cir. 2020), *cert. granted sub nom. Dep't of Just. v. House Comm. on the Judiciary*, 141 S. Ct. 185 (2020) (quoting *In re Request for Access to Grand Jury Materials Grand Jury No. 81-1, Miami*, 833 F.2d 1438, 1445 (11th Cir. 1987)). By the Committee's own admission in this litigation, the subpoenas "played a critical role in furthering [the Committee's impeachment] inquiry, not only in corroborating witness testimony, but also by filling numerous factual gaps." Appellees Br. 19. We do not know the content of the subpoenas

---

[4] *See* Cong. Globe, 39th Cong., 2d Sess. 320–21 (1867) (President Andrew Johnson); H.R. Res. 803, 93d Cong. (1974) (President Nixon); H.R. Res. 581, 105th Cong. (1998) (President Clinton).

at issue. But it is reasonable to conclude on this record that the subpoenas contain information of significant public interest.

"A district court weighing the second factor should consider the public's previous access to the . . . [specific] information [sought], not its previous access to the information available [regarding] the overall" subject matter. *Cable News Network, Inc. v. FBI*, 984 F.3d 114, 119 (D.C. Cir. 2021). It is undisputed that the public has had no access to the subpoenas at issue. It is of no moment that the Committee has selectively released to the public other information regarding its impeachment inquiry. "[T]he appropriate question is whether the public has previously accessed the . . . information [sought] . . . , not whether the government has previously disclosed other information." *Id.* The answer to that question is no.

The fourth *Hubbard* factor addresses the Committee's asserted interest "in maintaining the confidentiality of its investigative files" and in protecting "the substantial privacy interests . . . at stake." Appellees Br. 28.[5] Confidentiality and privacy interests are plainly substantial interests in the ordinary case. But the Committee, by its own actions, has largely eroded those interests in this case. Specifically, the Committee released to the public unredacted versions of the subpoena

---

[5] In dicta, the district court stated that "the requested disclosure of the subpoenas would . . . likely fail the second part of the two-part test for public access" because the "Congress may 'insist on the confidentiality of investigative files.'" *Schiff*, 474 F.Supp.3d at 316 n.5 (quoting *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 420 (D.C. Cir. 1995)). But the district court did not address the five *Hubbard* factors applicable to the second-step balancing test. Although, as noted, the Committee's confidentiality interest is relevant to the fourth *Hubbard* factor, no single factor is dispositive—the competing interests must be appropriately weighed.

cover letters and schedules sent to private individuals in connection with its impeachment inquiry.[6] Moreover, in its impeachment inquiry report released to the public, the Committee identified, by name, the individuals who allegedly participated in certain telephone calls—apparently using information received in response to the subpoenas it issued to telecommunications providers.[7] The Committee Report also publicly revealed the identity of one of the telecommunications providers, AT&T Inc., to which a subpoena or subpoenas were

---

[6] *See, e.g.*, Letter from Adam B. Schiff, Chairman, House Permanent Select Committee on Intelligence, *et al.*, to Rudolph ("Rudy") W. L. Giuliani (Sept. 30, 2019), https://oversight.house .gov/sites/democrats.oversight.house.gov/files/documents/2019093 0%20-%20Giuliani%20HPSCI%20Subpoena%20Letter.pdf; Subpoena Schedule Sent to Rudy Giuliani (Sept. 30, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/file s/documents/20190930%20-%20Giuliani%20HPSCI%20Subpoena %20Schedule%20Only.pdf; Letter from Adam B. Schiff, Chairman, House Permanent Select Committee on Intelligence, *et al.*, to Lev Parnas (Sept. 30, 2019), https://oversight.house.gov/sites/democrats .oversight.house.gov/files/documents/20190930%20-%20Parnas%2 0Letter%20and%20Doc%20Request%20Schedule.pdf; Letter from Adam B. Schiff, Chairman, House Permanent Select Committee on Intelligence, *et al.*, to Igor Fruman (Sept. 30, 2019), https://oversight. house.gov/sites/democrats.oversight.house.gov/files/documents/20 190930%20-%20Fruman%20Letter%20and%20Doc%20Request% 20Schedule.pdf; Letter from Adam B. Schiff, Chairman, House Permanent Select Committee on Intelligence, *et al.*, to Semyon Kislin (Sept. 30, 2019), https://oversight.house.gov/sites/democrats. oversight.house.gov/files/documents/20190930%20-%20Kislin%20 Letter%20and%20Doc%20Request%20Schedule.pdf.

[7] *See, e.g.*, House Permanent Select Committee on Intelligence, The Trump-Ukraine Impeachment Inquiry Report (Committee Report) (Dec. 2019), 45 n.69, 46 nn.76–78, 47 nn.82– 85, 64 n.255, https://intelligence.house.gov/uploadedfiles/the_trump -ukraine_impeachment_inquiry_report.pdf.

issued as well as the date of the subpoena return, viz., September 30, 2019.[8] There is no doubt that confidentiality and privacy interests remain in certain information contained in the subpoenas at issue—for example, the specific 10-digit telephone numbers associated with the private individuals' subpoenaed accounts. But that private information could be redacted in any disclosure. The Committee, having already compromised those confidentiality and privacy interests intrinsic to the names of the subscribers associated with the subpoenas, has tipped the fourth-factor balance to Judicial Watch.

With respect to the third and fifth *Hubbard* factors, the Speech or Debate Clause puts a weighty thumb on the scale in favor of the Committee's desire for non-disclosure. As the majority opinion notes, the Speech or Debate Clause's "purpose is 'to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process.'" Maj. Op. 4. (quoting *United States v. Brewster*, 408 U.S. 501, 524 (1972)). Moreover, "'legislative independence is imperiled' when a 'civil action . . . creates a distraction and forces [congressmen] to divert their time, energy, and attention from their legislative tasks to defend the litigation.'" *Id.* at 6 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)). Accordingly, Speech or Debate Clause jurisprudence makes plain that the Committee suffers prejudice if forced to litigate whether the subpoenas are subject to public disclosure pursuant to the common law right of access.

Nevertheless, the fundamental importance of the common law right of access to a democratic state—a right "predat[ing]

---

[8] *See, e.g.*, *id.* at 44 n.49 ("AT&T Document Production, Bates ATTHPSCI _20190930_00768- ATTHPSCI _20190930_00772, ATTHPSCI _20190930_00775"); *see also* Oral Arg. Tr. 11.

the Constitution itself"—cautions against the categorical extension of Speech or Debate Clause immunity to the right. *Mitchell*, 551 F.2d at 1260. Simply put, the Speech or Debate Clause should not bar disclosure of public records subject to the common law right of access in *all* circumstances. Instead, the Clause should be considered in weighing the interests for and against disclosure as part of the second-step balancing test. "The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know *what their government is up to*." *Reps. Comm. for Freedom of the Press*, 489 U.S. at 772–73 (emphasis in original) (quoting *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J., dissenting)).

I join in the judgment, however, because Judicial Watch did not adequately present the argument resolving the Speech or Debate Clause and common law right of access doctrines *inter se*. And "we do not consider arguments not presented to us." *Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259, 1263 (D.C. Cir. 1997) (en banc). "[W]e will not remedy the defect, especially where, as here, 'important questions of far-reaching significance' are involved." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (quoting *Alabama Power Co. v. Gorsuch*, 672 F.2d 1, 7 (D.C. Cir. 1982)).